CENTER FOR MARINE
CONSERVATION,
et al.

v.

Ronald BROWN, et al.

TEXAS SHRIMP ASSOCIATION, et al.

v.

Ronald BROWN, et al.

Civ. A. Nos. G–95–265, G–94–660.

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 21, 1996.

William E. Junell, Jr., Paul M. Bohannon, Andrews & Kurth, Houston, TX, Benjamin Sharp, Donald C. Baur, Washington, DC, for Center for Marine Conservation, Daniel Horovitz, Page S. Williams, Dr. Deborah Crouse.

Gaynelle Griffin Jones, U.S. Attorneys Office, Houston, TX, Daniel David Hu, U.S. Attorneys Office, Houston, TX, Elizabeth Lambert, Asst. Attorney General, Austin, TX, Christiana P. Perry, U.S. Dept. of Justice, Washington, DC, James C. Kilbourne, U.S. Dept. of Justice, Washington, DC, Anthony P. Hoang, U.S. Dept. of Justice, Washington, DC, for Ronald NMI Brown, James Baker, Rolland A. Schmitten, Dr. Andrew J. Kemmerer, and Wayne Swingle.

Wesley Blevins, Seadrift, TX, pro se.

Richard Moore, Dickinson, TX, pro se.

Terry Ricks, Aransas Pass, TX, pro se.

Michael K. Bell, Bell & Murphy, Houston, TX, James P. Walsh, Washington, DC, for National Fisheries Institute, Texas Shrimp Association.

### ORDER

KENT, District Judge.

This case began as action by the CMC under the Endangered Species Act (the CMC Action) to force various agencies and employees of the United States (the Federal Defendants) to protect five species of threatened and endangered sea turtles by implementing and enforcing regulations designed to reduce the number of turtles killed as a result of commercial shrimping. The National Fisheries Institute and the Texas Shrimp Association (together, the Shrimp Industry Intervenors or the Intervenors), representing the interests of certain members of the shrimping industry, intervened in the CMC Action. The Intervenors then filed a separate action against the Federal Defendants challenging certain actions of the Defendants under the Administrative Procedure Act (the Shrimpers Action). On June 30, 1995, this Court granted the CMC's Motion to intervene in the Shrimpers Action, and consolidated the Shrimpers Action into the CMC Action. After various motions and procedural machinations, the Court is now presented with a multitude of competing dispositive motions—the CMC's Motion for Summary Judgment in its favor in the CMC Action, the CMC's Motion to Dismiss or for Summary Judgment against the Shrimpers Action, the Intervenors' Motion for Summary in its favor in the Shrimpers Action, the Intervenors' Motion for Summary Judgment against the CMC Action, and the Federal Defendants' Motion for Summary Judgement in its favor in both the CMC Action and the Shrimpers Action. As will be set forth in detail below, the Federal Defendants' Motion for Summary Judgment in the CMC Action and the Shrimpers Action, the CMC's Motion for Summary Judgment against the Shrimpers Action, and the Intervenors' Motion for Summary Judgment against the CMC Action are hereby **GRANTED,** and the remaining Motions are hereby **DENIED.**

### I. THE STATUTORY FRAMEWORK

#### A. The Endangered Species Act

The Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544, one of the most stringent environmental laws, was enacted in an attempt to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978). Under the ESA, the Secretary of Commerce or the Secretary of the Interior must make determinations about the status of certain species, and must determine whether a species qualifies as "endangered" or "threatened." [1] Once a species is listed, it

---

1. The Secretary of the Interior is generally responsible for all terrestrial species, while the Secretary of Commerce is responsible for most marine species. 16 U.S.C. § 1533(a)(2). Be-

is afforded certain protections under the ESA, and federal agencies assume special obligations to conserve the listed species. 16 U.S.C. § 1536(a)(1). Any "taking" of an endangered species is prohibited. 16 U.S.C. § 1538(a)(1)(B).[2] This prohibition also extends to the taking of threatened sea turtles. 50 C.F.R. § 227.71(a). However, "incidental takes" of listed species—takings not directed at the species itself but incidentally arising from otherwise lawful activities—may be authorized by the Secretary subject to certain conditions. 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 402.02.

To ensure that federal agency actions "are not likely to jeopardize the continued existence of any endangered species," the ESA requires any federal agency to consult with the Secretary with regard to any action it authorizes, funds, or carries out, if that action may affect any endangered or threatened species. *See* 16 U.S.C. § 1536(a)(2) (requiring consultation); 50 C.F.R. § 402.02 (defining agency action). For actions that may affect certain species, including sea turtles while in the water, the National Marine Fisheries Service (NMFS) is designated as the agency with which the "action" agencies must consult. 50 C.F.R. § 402.01(b).

After the consultation between the NMFS and the action agency, the NMFS must issue a written biological opinion detailing how the agency action will or does affect the listed species. The opinion must include NMFS's opinion as to whether the action is likely to jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(b)(3)(A). If the NMFS concludes the action is likely to jeopardize the continued existence of the listed species, it must suggest the "reasonable and prudent alternatives" which can be taken by the action agency to ensure its actions do not jeopardize the continued existence of the listed species. *Id.* If the NMFS concludes the proposed action will not jeopardize the continued existence of the listed species, or provides the action agency with any reasonable and prudent alternatives, *and* concludes

that an incidental taking of the species may occur, the NMFS must issue an incidental take statement (ITS) containing reasonable and prudent measures necessary or appropriate to minimize the impact of the incidental take of the species. 16 U.S.C. § 1536(b)(4). The ITS must contain the terms and conditions that must be complied with by the action agency in order to implement the reasonable and prudent measures necessary to minimize the impact of the incidental take. *Id.* If the action agency complies with the terms of the ITS, any taking contemplated by the ITS statement is not considered to be a prohibited taking. 16 U.S.C. § 1536(*o* )(2).

The Federal Defendants administer the Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882 (FCMA), which governs the use of the United States' fishery resources. *See* 16 U.S.C. § 1801; *see generally United States v. F/V Alice Amanda,* 987 F.2d 1078, 1079 (4th Cir.1993). Under the FCMA, regional management councils prepare and amend Fishery Management Plans (FMPs), which are implemented through regulations promulgated by the NMFS through notice and comment rulemaking procedures. 16 U.S.C. § 1852, 1854(a), (b), and (c)(2). The Federal Defendants' authorization of the shrimp fishery FMP triggers the consultation requirement of section 1536(a)(2) of the ESA.

The five species of sea turtles occurring in United States waters are loggerhead, leatherback, green, hawksbill, and Kemp's ridley, and all five species are listed as either endangered or threatened under the ESA. 50 C.F.R. §§ 222.23(a), 227.4. The Secretary of Commerce has delegated his ESA responsibility over sea turtles to the NMFS. In 1987, the NMFS issued regulations to protect the threatened and endangered sea turtles. 52 Fed.Reg. 24244 (June 29, 1987); Administrative Record (AR) II.A.1; AR II. C.7. As amended in 1992, the regulations require most shrimp trawlers in inshore and offshore waters to install and use a NMFS-

---

cause this action involves sea turtles in the water, the Secretary of Commerce bears the responsibility under the ESA.

**2.** To "take" is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

approved turtle excluder device (TED) in each net year round. 50 C.F.R. § 227.72(e)(2); AR II.D.8.

In 1992, the NMFS adopted regulations creating an emergency framework through which the agency could take certain limited action to address the taking of sea turtles. 50 C.F.R. 227.72(e)(6). The regulations provide that the exception for incidental takings of sea turtles does not apply to takings that would violate the restrictions, terms, or conditions of an incidental take statement or permit, or that may be likely to jeopardize the continued existence of a listed species. 50 C.F.R. 227.72(e)(6)(i). The NMFS may determine that incidental takings of sea turtles are unauthorized, and may restrict activities if necessary to avoid unauthorized takings that may be likely to jeopardize the continued existence of a listed species. 50 C.F.R. § 227.72(e)(6)(ii). These restrictions are published in the Federal Register, and are effective for no more than 30 days unless extended through another notice action. _Id._ § 227.72(e)(6)(v).

B. The National Environmental Policy Act

■ The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, requires federal agencies to prepare an environmental impact statement (EIS) to be included in every major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). NEPA is a procedural process that mandates a process rather than a result. _Sierra Club v. Espy,_ 38 F.3d 792, 796 (5th Cir.1994). NEPA does not require that an agency select an environmentally favorable course of action, but only that the agency make its decision to proceed with a particular action after taking a "hard look" at environmental consequences. _Sabine River Auth. v. United States Dep't. of Interior,_ 951 F.2d 669, 676 (5th Cir.), _cert. denied,_ 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992) (quoting _Robertson v. Methow Valley Citizens Council,_ 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)). NEPA prohibits uninformed, not unwise, agency actions. _Sabine,_ 951 F.2d at 676.

■ An EIS must contain a "detailed statement of the expected adverse consequences of an action, the resource commitments involved in it, and the alternatives to it." _Kleppe v. Sierra Club,_ 427 U.S. 390, 401–02, 96 S.Ct. 2718, 2726–27, 49 L.Ed.2d 576 (1976). In order to determine whether an EIS is required, the agency may prepare an environmental assessment (EA), which is a rough, less detailed statement intended to determine whether environmental impacts are significant enough to require the preparation of an EIS. _Sierra Club,_ 38 F.3d at 802. If the EA concludes that the action will have no significant impact on the quality of the human environment, no EIS is required. _Id._ at 796. The agency action at issue in this case is the Federal Defendants' authorization of the shrimp fishery by way of the FMCA and the shrimp fishery FMP.

## II. FACTUAL BACKGROUND

In 1992, the NMFS consulted on the shrimp fishing operations authorized by the FMP and its amendments, and issued a biological opinion on December 8, 1992. AR II.D.9. The biological opinion concluded that with the implementation of the 1992 Final Sea Turtle Regulations requiring the use of TEDs, the shrimp trawl fishery was not likely to jeopardize the continued existence of the turtles. AR II.D.9 at 20. The opinion included an incidental take statement allowing for a _documented_ incidental take level of 4 hawksbill turtles, 4 leatherback turtles, 10 Kemp's ridley turtles, 10 green turtles, or 370 loggerhead turtles. AR II.D.9. Documented takes are takings by a shrimp trawler witnessed and reported by a NMFS-approved observer or an enforcement agent.

In April and May 1994, over 200 sea turtles stranded on the Texas coast. "Stranded" turtles are turtles, dead or alive, washed up on beaches, not including nesting turtles. Many of the stranded turtles were the highly endangered Kemp's ridleys. The high level of strandings coincided with heavy nearshore shrimping. AR II.E.165 at 2. In response to the strandings, the Federal Defendants conducted necropsies and observations to dismiss other causes of the mortalities. AR II.E.165 at 3; II.E.4–7, 10, 14, 19, 43, 69, 70, 79. Pursuant to 50 C.F.R. § 402.16(b), the

Federal Defendants also reinitiated consultation on the effects of the shrimping industry. AR II.E.12, 17.

Concluding that many TEDs were improperly installed, the NMFS promulgated an interim rule amending the TED regulations to require flotation on bottom-opening, single-grid TEDs. AR. II.E.31. A biological opinion issued on June 28, 1994, concluded that with the additional requirement of flotation for bottom-opening TEDs, the continued operation of the shrimp fishery was not likely to jeopardize the continued existence of the sea turtles. AR II.E.28. The regulations requiring flotation were adopted in final form on in 1995. 60 Fed.Reg. 15512 (1995); 50 C.F.R. § 227.72(e)(4)(i)(I).

In May 1994, the state of Texas closed its waters to shrimp fishing, in accordance with the Gulf of Mexico FMP.[3] During the eight week closure, there were 48 turtle strandings. AR II.E.165 at 4. When the Texas waters were reopened to shrimping on July 7, 1994, strandings increased dramatically, with 49 turtles stranding between July 10 and July 15. In response, the NMFS increased enforcement of the TED regulations. AR II.E.165 at 5; AR II.E.52, 56, 77, 78. Strandings decreased sharply during the periods of increased enforcement. AR II.E.165 at 5.

In July 1994, the Federal Defendants reinitiated consultation, and the consultation process culminated in the issuance of a biological opinion on November 14, 1994 (November Opinion). The November Opinion concluded the continued long-term operation of the shrimp fishery in the southeastern United States was likely to jeopardize the continued existence of the Kemp's ridley sea turtle if mortalities continued at the 1994 level, and was likely to prevent the recovery of the loggerhead sea turtle. AR II.E.165. The Opinion also concluded that no new information suggested the hawksbill, leatherback, and green sea turtles were being adversely affected by the shrimp fishery to an extent not already considered in the previous biological opinions. AR II.E.165 at 7. The No-

vember Opinion identified incorrect installation and improper use of TEDs by shrimpers as the major cause of stranding. Other causes also identified in the Opinion were the certification of TEDs that are ineffective or incompatible with net types, and intensive pulse fishing in areas of high turtle abundance. AR II.E.165 at 13–14.

The November Opinion identified a reasonable and prudent alternative (RPA) to the existing fisheries management scheme that would allow shrimping to continue without jeopardizing the turtles. The RPA consisted of certain short-term requirements for the remainder of the 1994 shrimping season, as well various long-term requirements. AR II.E.165 at 16–18. For the remainder of the 1994 season, the RPA required NMFS to "insure that enforcement efforts, in cooperation with state and federal agencies, will remain at or near current enforcement levels, as of October 15, 1994, in the Gulf of Mexico and Atlantic through November 30, 1994." AR II.E.165 at 16. The long-term provisions of the RPA was comprised of three separate components: improving the compliance with TED regulations; reexamining certain NMFS-approved TEDs; and mitigating the impacts of intensive nearshore shrimping. AR II.E.165 at 16–18.

As part of the requirement to improve compliance with TED regulations, the RPA required the NMFS to formulate an emergency response plan to respond to sea turtle strandings. The emergency response plan must include a system to quickly increase enforcement efforts in response to increased strandings or reports of increased noncompliance with TED regulations. The RPA required the plan to set forth specific guidelines for conservation measures to be implemented as mortality levels approach the established incidental take levels, and

must provide that in the event that sea turtle takings reach or exceed 75% of either the documented or indicated incidental take level established in the incidental take statement, NMFS must implement immediate conservation measures to re-

---

**3.** Every year, the state of Texas closes its waters to shrimping between approximately May 15 and July 15, to allow shrimp to mature and migrate.

duce the impact of shrimping in affected areas. These measures include, but are not limited to, the implementation of the following: prohibitions on nighttime shrimping, restrictions on the number and size of trawl nets, restrictions on the size of trynets, authorization of only top-shooting, hard-grid TEDs, or area closures. NMFS must ensure that conservation measures can be implemented in a timely manner.

AR II.E.165 at 16–17. The RPA required NMFS to form an enforcement team of at least five agents specially trained in TED technology to be deployed in response to reports of increased strandings, increased noncompliance, or intensive shrimping efforts in areas of expected turtle abundance. To further increase compliance with TED regulations, the RPA required NMFS to amplify TED technology transfer programs to provide information to shrimpers and gear manufacturers about the installation and efficient use of TEDs. Finally, the RPA required the NMFS to propose a registration and permitting system for shrimpers trawling in offshore waters to provide a means of improving enforcement and the delivery of information directly to shrimpers. AR II.E. 165 at 17–18.

As to the reexamination of certain TEDs, the RPA required the NMFS to reexamine soft TEDs and bottom-shooting hard TEDs to consider whether they effectively reduce the incidental take of turtles by shrimp trawlers. The RPA recommended the NMFS consider recalling soft TEDs or implement a program restricting the use of soft TEDs. Finally, the RPA recommended that NMFS review its TED approval procedures to ensure that approved TEDs can be effectively used by shrimpers. AR II.E.165 at 18.

The final long-term provision of the RPA required the NMFS to identify the areas requiring special management because of high turtle abundance or important nesting or foraging habitats and to propose measures to mitigate the impacts of intensive nearshore shrimping and to prevent repeated captures of individual turtles. The RPA suggested measures such as prohibitions on nighttime shrimping, restrictions on the number and size of trawl nets, restrictions on the size of trynets, authorization of only top-shooting, hard-grid TEDs, reduction of the density of shrimping vessels, or temporary area closures. AR II.E.165 at 18.

The November Opinion included an incidental take statement (ITS) allowing for a documented lethal or nonlethal take of 4 hawksbill turtles, 4 leatherback turtles, 4 green turtles, 8 Kemp's ridley turtles, or 20 loggerhead turtles. The ITS required the NMFS to reinitiate consultation if the documented take level was met or exceeded. In addition to the documented take level, the ITS also established an *indicated* take level, using stranding data as an indicator of actual take levels. The ITS provided that, during periods of intensive shrimping, if there are no significant or intervening natural or human sources of mortality other than shrimping conclusively identified as the cause of strandings, then strandings will be considered an indicator of lethal takes in the shrimp fishery if:

1) in areas of shrimping effort, weekly strandings in any NMFS statistical zone reach twice the previous three-year weekly average (taking into consideration anomalous years) for that zone; or

2) in areas of shrimping effort, weekly strandings in any NMFS statistical zone reach twice the highest weekly level during a shrimp fishery closure period (after the first seven days of closure) within the same season in that zone.

AR II.E.165, ITS at 2. The reasonable and prudent measures included in the ITS required the NMFS to take the emergency actions identified in the emergency response plan requirement of the November Opinion if "stranding levels indicate that either the documented or incidental take level is being approached." *Id.* The ITS required the NMFS to reinitiate consultation within two years after the date of the biological opinion, unless consultation was reinitiated sooner.

In addition, the ITS required more effective monitoring of take levels and shrimp fishery effort levels, and set out several steps necessary to accomplish this goal. First, the NMFS was to identify areas where increased effort was needed to adequately monitor sea

turtle strandings and ensure intensive stranding monitoring in states with low stranding coverage. AR II.E.165, ITS at 2.

Second, the NMFS must determine the previous three-year weekly stranding averages by statistical zone and inform state coordinators of the threshold levels, who were to timely inform the NMFS if strandings exceeded the thresholds. The ITS recommended the NMFS enter into a Memorandum of Understanding with the United States Fish & Wildlife Department to promote better beach monitoring. AR II.E.165, ITS at 3.

Third, the NMFS must improve observer coverage of the shrimp fishery to better document the level of incidental takes. Within two years of the date of the biological opinion, the NMFS should attempt to achieve a level of 1% observer coverage of offshore shrimping vessels. AR II.E.165, ITS at 3.

Fourth, the NMFS must select a team of population biologists, sea turtle scientists, and life history specialists to compile and study information on the status of sea turtle populations. The team was to attempt to determine the maximum number of individual sea turtles that can be taken without preventing the recovery of the listed species or jeopardizing the continued existence of any species. AR II.E.165, ITS at 3.

The final component of the ITS requirement for more effective monitoring of take levels and shrimp fishery effort levels provided that the NMFS was to evaluate other human-caused sources of sea turtle mortalities and identify measures to reduces those sources. AR II.E.165, ITS at 3.

In accordance with the November Opinion, NMFS issued its Emergency Response Plan (ERP) on March 14, 1995. Supplemental Administrative Record (SAR) A.21. The ERP was published in the Federal Register on April 21, 1995. 60 Fed.Reg. 19885 (1995). The ERP establishes two areas of historically high Kemp's ridley strandings (the Special Management Areas), and requires increased scrutiny of these areas to mitigate the impact of shrimping on the Kemp's ridley turtles. SAR A.21 at 3. The ERP requires elevated enforcement of TED regulations in coordina-

tion with Coast Guard, NMFS, state enforcement agents, and members of a trained TED law enforcement team. If 75% or greater of the indicated take level is reached for two consecutive weeks in any statistical zone within either of the Special Management Areas, the ERP provides that emergency regulations will be promulgated pursuant to the NMFS's emergency rulemaking authority under 50 C.F.R. § 227.72(e)(6). The emergency regulations will include the prohibition of the use of soft TEDs and bottom-opening TEDs; the prohibition of the use of try nets, unless equipped with legal TEDs; and the prohibition of the use of flaps over the escape openings of TEDs. SAR A.21 at 3–4. If strandings are not reduced to less than 75% of the indicated take levels for two consecutive weeks after the imposition of the emergency regulations, the ERP requires closure of the shrimp fisheries in the areas where the strandings remain high. SAR A.21 at 5. If the NMFS concludes that implementation of the emergency regulations or closure is not necessary despite elevated strandings in the Special Management Areas, such a determination must be summarized in a Memorandum to the Record. *Id.*

In the areas outside the Special Management Areas, the ERP requires evaluation of local conditions and mortality factors present in the statistical zones with elevated strandings, and provides that increased enforcement efforts may be required in these areas. If increased enforcement measures are insufficient to reduce strandings below historical levels for one month, the NMFS must determine whether further action is warranted after considering certain specified factors. SAR A.21 at 5–6. If strandings reach or exceed 75% of the indicated take level for more than two weeks after additional restrictions are imposed, area closures may be ordered as necessary. SAR A.21 at 6.

Almost immediately after the ERP was announced, sea turtle strandings in the Gulf of Mexico exceeded the established incidental take levels. The NMFS reinitiated consultation, and issued a supplemental biological opinion on April 26, 1995. SAR B. 8. The April opinion determined that the strandings in Texas were similar to the levels in 1994,

and that implementation of emergency restrictions were required to avoid jeopardy. The opinion also considered the elevated strandings in Florida and North Carolina, and concluded that, while the ITLs for those zones had been exceeded, no emergency restrictions were required in those areas, because the shrimp fishery was not operating nearshore in the areas of elevated strandings. The opinion required further monitoring of those strandings. SAR B. 8.

The April biological opinion provided that the November Opinion remained valid, except for its incidental take statement, which was superseded by the ITS included in the April opinion. The primary difference in the April ITS was that it established firm numerical incidental take levels based on the formula included in the ITS of the November Opinion. The reasonable and prudent measures required in the April ITS were largely the same as those of the November Opinion, which were incorporated into the April ITS.

In accordance with the procedures set forth in the ERP and as required by the April biological opinion, the NMFS implemented an emergency 30–day gear restriction in zones 18 and 20 and a portion of zone 17. 60 Fed.Reg. 21741–44 (1995). The gear restrictions were effective from 12:01 a.m. April 30, 1995, through 11:59 a.m. May 29, 1995. On May 18, 1995, in response to comments from the shrimping industry, the NMFS modified the emergency restrictions by partially rescinding the prohibition against the use of try nets not equipped with TEDs. 60 Fed.Reg. 26691 (1995). During the period the gear restrictions were in effect, strandings declined. SAR B. 44 at 4.

As a result of increased strandings in some zones in May 1995, the NMFS again reinitiated consultation and issued a supplemental biological opinion on June 14, 1995. SAR B. 44. The opinion considered all instances in which the ITL had been exceeded through June 3, 1995, as well as the anticipated impact of the reopening of Texas waters to shrimping. Historically, sea turtles strandings drop dramatically during the Texas closure, and then increase sharply when shrimping is resumed. Anticipating increased strandings on the reopening of the

Texas waters, the June biological opinion concluded that gear restrictions should be imposed in Texas upon reopening to keep the level of strandings below the 1994 jeopardy levels. SAR B. 44 at 10. The opinion determined that excessive strandings in Georgia required the implementation of emergency restrictions. The opinion also concluded that proper installation of soft TEDs was critical to ensure proper functioning of the TEDs and to reduce strandings.

On June 20, 1995, the NMFS implemented the emergency restriction is Georgia as recommended by the June biological opinion. 60 Fed.Reg. 32121 (1995). The NMFS also issued a proposed rule implementing the ERP gear restrictions in offshore Texas waters for a period of thirty days after reopening of the fishery. 60 Fed.Reg. 31696 (1995). After holding public hearings, the NMFS elected not to implement the proposed rule, and requested voluntary compliance with the gear restrictions. The proposed rule was formally withdrawn on August 18, 1995. 60 Fed.Reg. 43106 (August 18, 1995).

Not unexpectedly, turtle strandings increased significantly after the Texas waters were reopened. In response to a motion for a preliminary injunction by the CMC, on August 1, 1995, this Court issued an Order imposing certain gear restrictions in Texas and southwestern Louisiana, effective through September 10, 1995. During the period this Court's Order was in effect, strandings decreased.

On August 9, 1995, the NMFS issued yet another supplemental biological opinion. SAR B.79. The opinion concluded that while strandings in Texas exceeded established incidental take levels, the Court's Order imposing gear restrictions obviated the need to impose emergency restrictions in Texas. The opinion noted high compliance with TED regulations in Texas, and stated that industry cooperation was essential to ensure the survival of the Kemp's ridley turtle. In light of elevated strandings in South Carolina and Georgia, the opinion recommended implementing emergency restrictions. However, the opinion determined that the strandings occurring in North Carolina were not caused by the shrimping industry. The opinion also

concluded that the ERP generally had been successful in reducing strandings. SAR B.79 at 12. The emergency gear restrictions in South Carolina and Georgia recommended in the opinion were implemented effective August 11, 1995. 60 Fed.Reg. 42809 (1995).

The August biological opinion largely adopted the April 1995 incidental take statement. However, the August ITS modified one of the reasonable and prudent measures set forth in the April ITS by providing that if stranding levels indicate that either the documented or indicated take level is being approached, "the NMFS shall take emergency actions identified in the Emergency Response Plan, as necessary to respond to observations and conditions in the areas of elevated strandings." SAR B. 79 at 15. The reasonable and prudent measure in the April ITS did not include the "as necessary" language included in the August ITS. SAR B. 8, ITS at 2.

The August 9 biological opinion was supplemented by an additional biological opinion dated August 16, 1995, which considered the effects of this Court's order prohibiting the use of soft TEDs. The opinion made no change to the August 9 opinion, and incorporated the ITS of the August 9 opinion.

On October 5, 1995, after receiving comments from the shrimping industry, the NMFS revised the Emergency Response Plan. SAR A. 92. The Revised ERP follows the same framework as the original ERP, but makes certain changes to the gear requirements. However, the revised ERP gives the NMFS the discretion to implement some of the listed gear restrictions, while the

original ERP required the NMFS to implement all the gear restrictions.[4]

### III. THE CMC ACTION

In the face of increasing sea turtle strandings in the Gulf of Mexico, the CMC Action was filed on October 3, 1994, before the issuance by the NMFS of the November 1994 Biological Opinion. Count I of the CMC Complaint alleges that the Federal Defendants violated 16 U.S.C. § 1536(a)(2) of the ESA by failing to reinitiate formal consultation after the incidental take limits were exceeded.[5] Count II of the CMC Complaint alleges the Federal Defendants have violated their substantive duty under 16 U.S.C. § 1536(a)(2) to ensure that their actions or the actions taken by others under their authority is not likely to jeopardize the continued existence of the sea turtles. In Count III, the CMC contends the Federal Defendants have unlawfully "taken" sea turtles by allowing the shrimp fishery to take protected turtles in excess of the levels established in the June 1994 biological opinion and incidental take statement and in numbers that jeopardize the survival and recovery of the turtle species. In Count IV, the CMC contends the Federal Defendants have violated their duty under 16 U.S.C. § 1536(a)(1) to "conserve" threatened and endangered species. Count VI[6] alleges a violation of the National Environmental Policy Act, and Count VII alleges violations of the Administrative Procedure Act. The CMC seeks declaratory and injunctive relief.

#### A. ESA Claims

##### (1) Mootness

The factual predicate of the CMC's Complaint is events occurring in the shrimp

4. As to the listed gear restrictions, the original ERP stated that "[r]estrictions to the fishery will include all of the following," SAR A. 21 at 4, while the Revised ERP states "[r]estrictions on the fishery will include *any or all* of the following." 60 Fed.Reg. 52121, 52126 (1995) (emphasis added).

5. In its Complaint, the CMC also contended the Federal Defendants violated the ESA by failing to reinitiate formal consultation on Amendment 6 to the Gulf of Mexico Fishery Management Plan. Because the CMC does not raise this argument in its Motion for Summary Judgement, the Court treats the issue as abandoned. Count I of the CMC's Complaint also included an allegation

that the Federal Defendants were in violation of the ESA by failing to prevent the irretrievable or irreversible commitment of resources that has the effect of foreclosing reasonable and prudent measures that would avoid jeopardy. *See* 50 C.F.R. § 402.09. However, because the CMC does not address this allegation in its Motion for Summary Judgment, the Court also treats this issue as abandoned.

6. Count V of the CMC's Complaint, which alleged a violation of the Fisheries Conservation and Management Act, was dismissed on November 28, 1995.

fishery in 1994, and the actions or inactions of the Federal Defendants in response to sea turtle strandings in 1994. However, as detailed above, the Federal Defendants reinitiated formal consultation in the summer of 1994, which consultation culminated in the release of the November 14, 1994, Biological Opinion. Moreover, since the November Opinion, the Federal Defendants have reinitiated consultation four times in 1995, and have issued new biological opinions April 26, 1995, June 14, 1995, August 8, 1995, and August 16, 1995. The CMC Complaint includes no allegations regarding any actions or inaction after the November Opinion, and does not challenge the November Opinion or any of the subsequent biological opinions. Accordingly, noting that the CMC failed to amend its Complaint despite the opportunity to do so,[7] the Federal Defendants and the Shrimp Industry Intervenors contend the CMC's ESA claims should be dismissed as moot.[8] The CMC, however, contends its Complaint presents this Court with a ripe controversy in spite of the absence of allegations of post–1994 events.

■ A federal court lacks authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992). Thus, if the challenged action has already taken place, or an event occurs that prevents the court from granting any effectual relief, the claim is moot and must be dismissed. *Id.; see also Northwest Resource Information Ctr., Inc. v. National Marine Fisheries Service*, 56 F.3d 1060, 1069 (9th Cir.1995). The mootness doctrine is a part of the constitutional grant of federal jurisdiction only to cases or controversies. *Powell v. McCormack*, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1951 n. 7, 23 L.Ed.2d 491 (1969). If the challenged action has already occurred, generally no relief can be granted, and there is no live case or controversy before the Court. The mootness doctrine is particularly applicable in cases where injunctive relief is sought. "Where the activities sought to be enjoined have already occurred, and the [court] cannot undo what has already been done, the action is moot." *Northwest Resource*, 56 F.3d at 1069.

■ However, there is an exception to the mootness doctrine for issues that are capable of repetition yet evading review. *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n.*, 219 U.S. 498, 514–15, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Northwest Resource*, 56 F.3d at 1070; *Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1447 (5th Cir.1991). This exception is met if there is a reasonable expectation that the challenged conduct will be repeated and affect the plaintiff, and the harm is of a limited duration so that it is likely to be moot before the litigation is completed. *Vieux Carre*, 948 F.2d at 1447; *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir.1992) (claim involving governmental action is not moot if the action is too short to allow full litigation before it ceases and there is a reasonable expectation that the plaintiff will be subjected to the action again).

The CMC contends the Federal Defendants have violated their obligations under the ESA by failing to reinitiate consultation, failing to ensure its actions do not jeopardize the continued existence of the sea turtles, failing to conserve the sea turtles, and by allowing unauthorized takes of sea turtles. Clearly, the Federal Defendants have satisfied at least a portion of those obligations with regard to the 1994 strandings by reinitiating consultation, issuing the biological opinions, and imposing emergency restrictions on the shrimp fisheries. If the Federal Defendants' ESA obligations were related to discrete events or could be satisfied by actions of long duration, their compliance in 1994–95 would likely render the CMC's claims moot.

---

7. At a status conference held on June 30, 1995, the Court directed the parties to amend their pleadings as necessary to include any new claims. The CMC did not amend its Complaint.

8. The Intervenors also contend the CMC's notice of intent to sue was insufficient. The Court, however, concludes the CMC's notice directed to the Federal Defendants of their alleged violations satisfies the ESA's sixty day notice requirement.

*See, e.g., Northwest Resource,* 56 F.3d at 1069–70 (where the challenged incidental take permit was expired, and new permit issued was valid for four years, challenge to the expired permit was moot, because duration of new permit was sufficient to allow judicial review of that permit); *Lone Rock Timber Co. v. United States Dep't. of Interior,* 842 F.Supp. 433, 438 (D.Or.1994) (where plaintiffs brought action to compel the Fish and Wildlife Service to issue biological opinions on specific timber sales, claims were moot after opinions were issued).

■ Here, however, the ESA obligations that the CMC contends are not being satisfied are triggered by elevated stranding levels—events that history reveals happen all too frequently. Because the incidental take statement requires the Federal Defendants to respond quickly to increased strandings, it would be highly unlikely that a claim based on the Federal Defendants' actions during a specific period of time could be litigated before the Defendants took some action based on later events. Thus, this case presents a classic example of claims that are capable of repetition yet evade review. Moreover, while the factual predicate of the CMC's Complaint is events occurring in 1994, the Complaint, when fairly read, states claims of continuing violations of the ESA by the Federal Defendants, and therefore presents the Court with a live dispute. Accordingly, the Court concludes that the CMC's ESA claims are not moot.[9]

### (2) Standard of Review

■ While the Endangered Species Act permits citizen suits and judicial review of agency action, it does not specify the standard to be applied when reviewing the challenged action. In the absence of a statutory review standard, the Court must look to the standard established by the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir.1995). Except for agency actions that are adjudicatory in nature, the APA provides that agency actions shall not be set aside unless found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

■ This standard of review is very narrow and very deferential to conclusions and actions of the agency. "Under this standard, administrative action is upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Glickman,* 67 F.3d at 97. While the reviewing Court must make a careful and searching inquiry into the facts, the Court cannot substitute its judgment for that of the agency. The agency's decision need not be ideal, so long as it is not arbitrary and capricious and so long as the agency gave at least minimal consideration to the relevant facts contained in the record. *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir. 1988). When the agency acts within its own sphere of expertise, the reviewing court must be very deferential. "An agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, the court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).

It is within the confines of this narrow standard that the Court must consider the various summary judgment motions in connection with the CMC's claims. Of course, summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not be granted if the evidence indicates that a

---

9. Nor does the Court find the CMC's failure to amend or supplement its Complaint to be fatal to its ESA claims. While it would have been preferable had the Complaint been supplemented with more current facts, it has long been clear to this Court and to the parties that the CMC was challenging actions of the Federal Defendants occurring after 1994. Allowing the CMC to support its Complaint with current factual information is not a surprise and not does work an unfairness to any party.

reasonable fact finder could find in favor of the non-moving party. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As will be made clear below, the Court concludes that summary judgment is proper in this case because the Federal Defendants have fully satisfied their statutory obligations and no genuine issues of fact exist.

### (3) Consultation

■■■ The CMC contends the Federal Defendants have violated the ESA by failing to reinitiate consultation after elevated stranding levels occurred. Reinitiation of formal consultation is required if "the amount or extent of taking specified in the incidental take statement is exceeded." 50 C.F.R. § 402.16(a). The CMC contends the incidental take levels have been exceeded seven times since the expiration of this Court's temporary Order on September 10, 1995, thus requiring the Federal Defendants to reinitiate formal consultation.

■■■ The incidental take statement of the August 9, 1995, biological opinion establishes a level of incidental takes for the shrimp fishery. The ITS provides that strandings will be considered an indicator of lethal takes by the shrimp fishery "[i]f during periods in which intensive shrimping effort occurs there are no significant or intervening natural or human sources of mortality other than shrimping conclusively identified as the cause of the strandings." SAR B. 79 at 14. Therefore, the Federal Defendants do not consider strandings that are not attributable to the shrimp fishery when determining

whether the incidental take level has been exceeded and consultation required. *See* Fed.Def.Memo. in Opp., exhibit 1, attachment B (hereafter Coogan Decl.) at 2–3.[10] However, weekly stranding reports include the number of *total* strandings documented, whether or not those strandings are attributable to the shrimp fishery. Coogan Decl. at 2–3. Thus, the fact that total sea turtle strandings exceeded the incidental take level established for the shrimp fishery does not necessarily mean that the shrimp fishery has exceeded its incidental take level.

However, the record and the other information provided by the Federal Defendants supports the CMC's assertion that strandings attributable to the shrimp fishery have exceeded the incidental take level seven times since the last biological opinion was issued on August 16, 1995. *See* Coogan Decl. at 5–12; SAR A. 94: Tables, Weekly report number 28, week 42). Whether or not the circumstances surrounding the strandings warranted the implementation of the ERP or other emergency restrictions, these stranding levels did trigger the requirement under 50 C.F.R. § 402.16 that formal consultation be reinitiated. However, the record also establishes that the Federal Defendants reinitiated consultation in September 1995. Coogan Decl. at 4. While evidence of the written request for consultation required by 50 C.F.R. § 402.14(c) would have been helpful to the Court, the Court finds the affidavit submitted by the Federal Defendants sufficient to establish that consultation has in fact been initiated. Thus, it is unnecessary for the Court to order the Federal Defendants to do what they have already done.[11] Accord-

---

**10.** In cases governed by the APA, the reviewing court is generally required to judge the agency's action only by the evidence contained in the administrative record. *E.g., Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). However, the Court concludes it is appropriate to consider extra-record evidence in this case. Because the Federal Defendants believed the CMC could not challenge any action occurring after 1994, the administrative record in this case is incomplete. Thus, effective review of the Federal Defendants' actions can be obtained only by resort to extra-record evidence. *See Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988) (court may inquire outside the record when necessary to explain the agency's action), *opinion amended,* 867 F.2d

1244 (9th Cir.1989); *cf. Camp,* 411 U.S. at 143, 93 S.Ct. at 1244 (where agency's failure to explain its action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or other testimony, such additional explanations of the reasons for the agency decision as may prove necessary."). Accordingly, the Court will consider the extra-record affidavits submitted by the Federal Defendants and the CMC. The Court notes that the CMC did not object to the extra-record evidence submitted by the Federal Defendants.

**11.** 50 C.F.R. § 402.14(e) provides that formal consultation concludes within 90 days after its initiation unless the agencies involved mutually

ingly, the CMC's Motion for Summary Judgment on its consultation claim is hereby DENIED, and the Federal Defendants's Motion for Summary Judgment against the consultation claim is hereby **GRANTED.**

### (4) Jeopardy

 The Endangered Species Act requires every federal agency to ensure that its actions are not "likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). The CMC contends the Federal Defendants have violated their substantive duty to avoid jeopardy by failing to comply with the requirements of their biological opinions and by failing to implement adequate protective measures. *See* CMC's Memorandum in Support at 39.

 In the November Opinion, the Federal Defendants fully analyzed the long-term and short-term impacts of the shrimping fishery on sea turtles. The Federal Defendants identified causes of the increased sea turtle strandings and suggested methods to avoid jeopardy to the turtles. While a biological opinion is not binding on the agency, an agency choosing to take action in the face of a critical biological opinion proceeds at the risk of a jeopardy finding. *See Defenders of Wildlife, Friends of Animals & Their Env't. v. Hodel,* 851 F.2d 1035, 1037 (8th Cir.1988); *National Wildlife Fed'n. v. Coleman,* 529 F.2d 359, 371 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Village of False Pass v. Watt,* 565 F.Supp. 1123, 1160–61 (D.Alaska 1983), *aff'd.,* 733 F.2d 605 (9th Cir.1984). However, as the CMC acknowledges, an agency generally can avoid a finding that it has placed an endangered or threatened species in jeopardy by complying with the reasonable and prudent alternatives spelled out

in a biological opinion, unless the decision to implement the biological opinion was arbitrary or capricious. *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy,* 898 F.2d 1410, 1415 (9th Cir.1990); *Tribal Village of Akutan v. Hodel,* 869 F.2d 1185, 1193 (9th Cir.1988), *cert. denied,* 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989).

The November Opinion [12] concluded that if sea turtle mortalities continued at the 1994 rate, the long-term operation of the shrimp fishery in the southeastern United States was likely to jeopardize the continued existence of the Kemp's ridley turtles and could prevent the recovery of loggerhead turtles. AR II.E.165 at 14. The Opinion set out several requirements as part of its reasonable and prudent alternative to prevent jeopardy to the turtles. The Federal Defendants contend they have complied with the terms and conditions of the November Opinion and its reasonable and prudent alternative, and therefore have not violated their duty to avoid jeopardy. The Court agrees.

The November Opinion required the NMFS to formulate an emergency response plan within four months of the date of the Opinion. On March 14, 1995, the NMFS issued an ERP meeting the requirements for the plan set forth in the Opinion. The Federal Defendants also established the required TED enforcement team, and engaged the Coast Guard to perform aerial surveys of coastal shrimping effort. In addition, the Federal Defendants expanded the TED technology transfer program, holding seminars and distributing brochures explaining the proper installation and use of TEDs. *See* AR A. 94: Weekly Reports; Coogan Decl. at 15; Fed.Def.'s Memo. in Opp., exhibits 2 and 3. All of these actions are in compliance with

---

agree to extend the consultation for a specific period of time. Such an agreement was apparently reached in this case, because the information before the Court indicates that the biological opinion has yet to be issued. The Court has complete confidence that the Federal Defendants are working diligently to prepare a biological opinion that considers all the relevant information and seeks to provide a long-term solution to the problem of sea turtle mortalities. Accordingly, the Court believes it would be wholly inappropriate under the circumstances of this case to

order the Federal Defendants to issue the biological opinion within a specific time frame. However, the Court suggests the Federal Defendants keep the CMC apprised of the status of the opinion.

12. While new biological opinions have been issued subsequent to the November Opinion, the November Opinion was incorporated into the subsequent opinions and remains effective, except for its incidental take statement.

the reasonable and prudent alternative set forth in the November Opinion.

The November Opinion also required the Federal Defendants to propose, by March 1995, a vessel registration system. On March 24, 1995, the Federal Defendants proposed a vessel registration system plan and options for its operation, thus satisfying the requirements of the Opinion. *See* Coogan Decl. at 14, attachment B. The CMC contends the proposal is not a true proposal and is insufficient because it "merely analyzes alternative registration methods. The intent of this alternative was that a public proposal for registration would be released for comment in March, 1995." CMC Memo. in Support at 40. The CMC further argues that the Federal Defendants' failure to comply with deadlines included in the proposal renders the proposal itself inadequate. The Court disagrees.

The November Opinion requires only that a vessel registration system be *proposed;* nothing in the Opinion requires that the proposal be submitted for public comment by March 1995. While submitting the proposal for public comment may be the best way to proceed with the registration, given the language of the Opinion, the Court cannot characterize as arbitrary and capricious the Federal Defendants' conclusion that its March proposal satisfied its obligations under the November Opinion. Moreover, given that the Opinion required only the proposal of a registration system and set no deadlines for the implementation of that system, the Federal Defendants apparent failure to meet deadlines included within the proposal does not render the proposal itself inadequate.

The Federal Defendants have also complied with the requirement of the November Opinion to reexamine soft TEDs and bottom shooting hard TEDs. *See* SAR A.1; A. 76; A. 81. The CMC apparently argues the Federal Defendants have violated their obligation to avoid jeopardy by not recalling soft TEDs. First, the Court notes the November Opinion does not require the recall of soft TEDs or bottom-shooting hard TEDs. Moreover, the record clearly establishes that the Federal Defendants are well aware of the problems with these TEDs, and have elected to deal with the problems through other measures short of recall, such as skill-building seminars, and rules requiring flotation for bottom-shooting TEDs. *See* SAR A. 94: Weekly Reports; Coogan Decl. at 14–16. Thus, even if the failure to recall had some relevance as to whether the Federal Defendants have complied with the November Opinion, the Court could not conclude from the record before it that the Defendants have acted arbitrarily or capriciously with regard to the TEDs. While the CMC may have preferred that the Federal Defendants made other decisions, the decisions made by the Defendants are rational and supported by the evidence.

Finally, the Federal Defendants have complied with the requirement that areas requiring special sea turtles management areas be identified. *See* Coogan Decl. at 14, 16. In September 1995, the Federal Defendants issued an advance notice of proposed rulemaking in connection with the designation of special management areas, and the Defendants anticipate final rulemaking shortly. *See* 60 Fed.Reg. 47544 (1995); Coogan Decl. at 13, 16. Until a final rule is promulgated, the ERP works to satisfy this requirement, in that it identifies two areas of high sea turtle abundance (the Special Management Areas discussed above) and establishes management measures to be applied in those areas. Therefore, because the Federal Defendants have complied with the reasonable and prudent alternative set forth in the November Opinion, they have complied with section 1536(a)(2)'s requirement that federal agencies ensure that their actions are not likely to jeopardize the continued existence of the sea turtles.

 Moreover, even if an agency does not fully implement the reasonable and prudent alternatives of a biological opinion, the agency has not violated its obligation to avoid jeopardy if it took "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species." *Tribal Village of Akutan,* 869 F.2d at 1193. Thus, even if this Court concluded the Federal Defendants did not fully implement the reasonable and prudent alternative of the November Opinion, the Court finds the alter-

native measures taken by the Defendants adequate and sufficient to avoid a jeopardy finding. *See* Coogan Decl. at 3–13.

■ The CMC, however, contends the Federal Defendants have violated section 1536(a)(2) by "not going far enough to protect sea turtles in the 1994 biological opinions, the 1995 biological opinions, and its agency actions." CMC Memo in Support at 41. According to the CMC, the Federal Defendants have not satisfied their obligation to prevent jeopardy because the sea turtles are not protected from the cumulative effects of shrimp fishing and other activities, the procedures for gear restrictions and closures are too slow, there is no provision to limit the number of fishing vessels or the level of fishing effort, the turtles are not adequately protected in inshore waters, and because there is no permanent action restricting the use of ineffective TEDs.

While the issues raised by the CMC may all be valid concerns, the argument that the Federal Defendants have not gone far enough is simply insufficient to establish the Defendants have violated their obligation to avoid jeopardy. Jeopardy is defined as "reduc[ing] appreciably the likelihood of both survival and recovery of the species." 50 C.F.R. § 402.02. Thus, the fact that shrimping may adversely affect sea turtles and that the Federal Defendants could do more to protect the turtles does not support a jeopardy finding.

■ The CMC has largely ignored the standard by which this Court must measure the actions of the Federal Defendants. An agency's compliance with section 1536(a)(2) is measured by the narrow arbitrary and capricious standard. That the Federal Defendants have not regulated all major causes of sea turtle mortality does not render the actions addressed to some of the causes arbitrary and capricious. *State of Louisiana ex. rel Guste v. Verity*, 853 F.2d 322, 332–33 (5th Cir.1988). The record establishes that the Federal Defendants have thoroughly considered the short-term and long-term effects of the shrimp fishery on the sea turtles and have elected to take those actions deemed necessary and proper to avoid jeopardizing the turtles while allowing shrimping to continue. The Federal Defendants recognize that long-term prophylactic measures to reduce turtle mortalities would be preferable to the present system of reactionary, temporary measures implemented in response to elevated stranding levels. They are working diligently to develop a plan providing long-term protection to the turtles. *See* Coogan Decl. at 19–22. Because the Federal Defendants have properly considered all important aspects of the relationship between the shrimp fishery and sea turtles, and have made rational, reasoned decisions based on facts established in the record, the Court cannot conclude that the Federal Defendants have acted arbitrarily or capriciously or abused their discretion in connection with the conclusions reached in the November Opinion or in the implementation of the November Opinion and its reasonable and prudent alternative. *See, e.g., Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (agency action is arbitrary and capricious if agency has entirely failed to consider an important aspect of the problem); *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir.1994) (agency action is not arbitrary or capricious if the decision was based on a consideration of the relevant factors and there was no clear error of judgment). The CMC has presented no evidence or argument that changes this conclusion.

As noted above, the November Opinion concluded that the shrimp fishery was likely to jeopardize the continued existence of the Kemp's ridley sea turtle and threaten the recovery of the loggerhead sea turtle if mortalities continued at the 1994 rate. Total strandings through November 1995 were somewhat lower than the same period in 1994—1,618 in 1995 as compared to 1,747 in 1994. However, the number of Kemp's ridley strandings declined ·dramatically—283 Kemp's ridleys stranded in 1995, while 446 stranded in 1994. Coogan Decl. at 22. The CMC does not challenge the limited jeopardy conclusion of the November Opinion, or offer any evidence to show that the Federal Defendants acted arbitrarily or capriciously when determining whether the shrimp fishery was likely to jeopardize the continued existence of the sea turtles. By reducing

total sea turtle mortalities (as evidenced by strandings) and reducing the Kemp's ridley mortalities ·significantly below the levels which would place the turtles in jeopardy, it is clear that, far from reducing the likelihood of both survival and recovery of the sea turtles, the actions taken by the Federal Defendants have increased the likelihood of survival and recovery. Thus, the Federal Defendants have satisfied their obligations under 16 U.S.C. § 1536(a)(2). Accordingly, the CMC's Motion for Summary Judgment on its jeopardy claim is hereby **DENIED** and the Federal Defendants' Motion for Summary Judgment against the jeopardy claim is hereby **GRANTED.**

### (5) Unauthorized Taking

The ESA makes it unlawful for any person, including a federal agent, department, or instrumentality, to "take" any threatened or endangered species. 16 U.S.C. § 1532(19), 1538(a)(1); 50 C.F.R. § 227.71(a). However, the ESA exempts certain takings from this prohibition by providing that "any taking that is in compliance with the terms and conditions specified in [an incidental take statement] shall not be considered to be a prohibited taking of the species." 16 U.S.C. § 1536(*o* ). The CMC contends the Federal Defendants have "taken" sea turtles because the strandings have exceeded the establishes incidental take levels, and because the Federal Defendants have not complied with the terms and conditions of the relevant incidental take statement.

The incidental take statement currently governing the actions of the Federal Defendants is the ITS included in the August 9, 1995, biological opinion (the August ITS). SAR B. 9. The Federal Defendants contend they have not violated the prohibition against unauthorized takes because they have complied with the terms and conditions of the August ITS. A review of the August ITS confirms this assertion.

As a reasonable and prudent measure to reduce the level of incidental takes, the August ITS requires the Federal Defendants to implement the Emergency Response Plan *as necessary* when strandings levels approach or exceed the levels established in the ITS. The CMC contends the August ITS requires the Federal Defendants to implement the ERP in its entirety every time strandings approach the incidental take level. This position, however, completely ignores the "as necessary" language of the August ITS. By requiring the Federal Defendants to implement the ERP as necessary, the August ITS clearly gives the Federal Defendants some discretion in deciding when or to what extent the ERP should be implemented. The CMC points to no information in the record establishing that the Federal Defendants abused this discretion or acted in an arbitrary or capricious manner when implementing the ERP. To the contrary, the record establishes that the Federal Defendants were always aware of the level of strandings, and responded to the strandings with the measures they deemed appropriate under the circumstances. *See, e.g.,* AR A. 94; SAR B. 13, B. 54, B. 81; Coogan Decl. at 5–13. The Federal Defendants complied with the requirement to implement the ERP as necessary and properly exercised the discretion given them by the August ITS.

The other reasonable and prudent measure required by the August ITS is that the Federal Defendants must ensure that incidental take levels and shrimp fishery effort are effectively monitored and accurately estimated. As part of the requirement, the August ITS required the Federal Defendants to ensure that intensive stranding monitoring be established in states with traditionally ·low coverage, increase observer coverage of the shrimp fishery low with a goal of reaching 1% coverage, assemble a team of experts to compile and study information about the status of the sea turtles, and evaluate other human-caused sources of sea turtle mortality, focusing on the mortalities in the waters of North Carolina and the east coast of Florida. SAR B. 79 at 15–16.

The Federal Defendants have satisfied these requirements. Meetings with state stranding network personnel were held in December 1994 and in March 1995 to identify the areas requiring greater stranding coverage. Coogan Decl. 16–18, attachment C. While observer coverage has not reached the 1% goal, the Federal Defendants have done everything possible to increase observer cov-

erage within budgetary constraints. *See* Coogan Decl. at 18; SAR A. 94: Weekly Reports. Given that the 1% standard was a goal to be aimed for rather than an absolute requirement, the Federal Defendants' compliance with this provision of the ITS is sufficient. Finally, the Federal Defendants have formed the required expert study team, and the team is currently collecting and analyzing information. Coogan Decl. at 19. Thus, because the Federal Defendants have complied with the reasonable and prudent measures of the August ITS, they have not violated the ESA's prohibition against takings of threatened or endangered species.

That the strandings have exceeded the levels established in the incidental take statement does not change this conclusion. Under section 1536(*o*), takings occurring in compliance with the terms and conditions of the reasonable and prudent measures set forth in an incidental take statement are not prohibited. Section 1536(*o*) does not provide that any taking in excess of the level set in an incidental take statement is prohibited. Takings in excess of an incidental take statement trigger the consultation requirement, 50 C.F.R. 402.16(a), but do not amount to a prohibited taking as long as the terms and conditions of the incidental take statement are satisfied.[13]

Again, the essence of the CMC's argument is that the Federal Defendants have not done enough to protect the sea turtles. However, none of the information presented by the CMC is sufficient for this Court to conclude that the Federal Defendants have not satisfied their statutory duties under the ESA. While it may well be that there are more actions that could be taken to provide additional protection to sea turtles, the Court's inquiry is limited to a determination of whether the Federal Defendants acted arbitrarily or capriciously in carrying out their obligations under the Endangered Species Act. *See Glickman,* 67 F.3d at 95 (arbitrary and capricious standard of review applies to takings claims under 16 U.S.C. § 1538(a)(1)). As discussed above, the Federal Defendants

have complied with the reasonable and prudent alternative of the November Opinion, and have satisfied the terms and conditions of the August ITS. Therefore, pursuant to 16 U.S.C. § 1536(*o*), the Federal Defendants have not engaged in any unauthorized takings of sea turtles. Accordingly, the CMC's Motion for Summary Judgment on its takings claim is hereby **DENIED** and the Federal Defendants' Motion for Summary Judgment against the takings claim is hereby **GRANTED.**

### (6) Duty to Conserve

The CMC's final claim under the Endangered Species Act is that the Federal Defendants have violated their duty under 16 U.S.C. § 1536(a)(1) to conserve threatened and endangered species. The CMC offers no new arguments in support of this claim, but instead contends the Federal Defendants have failed to carry out their conservation duty by failing to comply with its biological opinions and failing to remedy the deficiencies in the opinions and other programs. CMC's Memo in Support at 46. Given that the Court has rejected the CMC's claims that the Federal Defendants have not complied with the terms of the relevant biological opinions and incidental take statements, these rejected assertions can no more support a claim under section 1536(a)(1) than they could support a claim under section 1536(a)(2).

Nor can the CMC's duty to conserve claim be supported by amorphous claims of "deficiencies" in the biological opinions. The ESA requires all federal agencies to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered and threatened species." 16 U.S.C. § 1536(a)(1). Conservation is defined by the ESA as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer neces-

---

**13.** The NMFS's own regulations mirror this standard. 50 C.F.R. § 227.76(6)(i)(A) provides that the exemption for incidental takings of sea turtles does not authorize incidental takings of turtles

during fishing activities if the takings would "violate the restrictions, terms, or conditions of an incidental take statement or biological opinion."

sary." 16 U.S.C. § 1532(3). By requiring agencies to use the methods *necessary* to conserve a threatened or endangered species, the ESA clearly gives some measure of discretion to the agency in determining the necessary measures. *See Pyramid Lake Paiute Tribe of Indians v. United States Dep't. of the Navy,* 898 F.2d 1410, 1418 (9th Cir.1990) (the "Secretary is to be afforded some discretion in ascertaining how best to fulfill the mandate to conserve").

As the Court has repeatedly stated, it is constrained to review the actions of the Federal Defendants by the narrow arbitrary and capricious or abuse of discretion standard set forth in the APA. That the CMC may perceive the biological opinions and other actions of the Federal Defendants to be deficient does not establish that the Defendants acted arbitrarily or abused their discretion. The CMC points to no relevant information the Federal Defendants refused to consider or to any factual conclusion reached by the Defendants that is not supported by evidence in the record. The reasonable and prudent alternatives and measures established in the biological opinions and incidental take statements are reasonable decisions made after careful review of all the relevant information, and have been successful in reducing the level of sea turtle mortalities. The Federal Defendants' determination that the measures set forth in the biological opinions, incidental take statements, and the emergency response plan were sufficient to satisfy their statutory duty to conserve is rational and well supported by the evidence in the record, and, therefore, will not be disturbed by this Court. Accordingly, the CMC's Motion for Summary Judgment on its duty to conserve claim is hereby **DENIED** and the Federal Defendants' Motion for Summary Judgment against the conservation claim is hereby **GRANTED.**

### B. NEPA Claim

■ The CMC contends the Federal Defendants have violated NEPA by failing to issue a new or supplemental EIS in connection with the Gulf of Mexico shrimp fishery FMP or the amendments to the FMP. The Federal Defendants, however, argue that the CMC's NEPA claim is moot or not ripe, because they have agreed to go forward with a supplemental EIS in connection with the proposed ninth amendment to the FMP. AR I.H.1. The Court agrees.

Assuming without deciding that the Federal Defendants violated NEPA by failing to issue an EIS in connection with the shrimp fishery FMP or its amendments, the relief the Court would order is the precise action the Federal Defendants have already undertaken. The proposed EIS will include an assessment of, "based on currently available information, the impacts of the Gulf Shrimp trawl fisheries on ... protected species (endangered or threatened) in the Gulf of Mexico." AR I.H.1; 60 Fed.Reg. 1769 (1995). By assessing the impacts of the entire shrimp fishery on protected species, rather than focusing only on the impact on protected species of the proposed FMP amendment, the scope of the proposed EIS is broad enough to correct any NEPA violation that may have occurred in the past. Of course, any challenge to the supplemental EIS itself is not ripe for review, because there is no final agency action to review until the EIS is actually issued. *See, e.g., Greene County Planning Bd. v. Federal Power Comm'n.,* 490 F.2d 256, 258 (2d Cir.1973) (rejecting as not ripe a challenge to an EIS that had not been finalized by agency order.) Accordingly, the Court hereby **DENIES** the CMC's NEPA claim as moot or not yet ripe for review.

■ In its Opposition to the Federal Defendants' Motion for Summary Judgment, the CMC appears to be challenging the sufficiency of the EIS issued in 1981 in conjunction with the Gulf of Mexico shrimp fishery FMP and the sufficiency of the EAs issued in connection with the amendments to the FMP. *See* CMC Opposition at 16–21. In addition to the shrimping industry's impact on sea turtles, the CMC argues that the Federal Defendants failed to fully consider the industry's impact on other fishery resources in the Gulf of Mexico. In its Complaint and Motion for Summary Judgment, the CMC contended only that a new or supplemental EIS should be prepared; the sufficiency of the existing NEPA documents was never challenged. *See* CMC Complaint at

22–23; CMC Motion for Summary Judgment at 2. The CMC cannot use a response to a summary judgment motion as a vehicle to present a claim not included its Complaint. Thus, to the extent the CMC is attempting to challenge the sufficiency of the EIS and EAs conducted by the Federal Defendants, that claim is likewise **DENIED.**[14]

## IV. THE SHRIMPERS ACTION

### A. Biological Opinion and Emergency Response Plan

■ In Count I of their summary judgment motion, the Shrimp Industry Intervenors contend the November Opinion and Emergency Response Plan are unlawful because they were not promulgated and implemented in accordance with the APA.[15] In response, the CMC and the Federal Defendants first argue that, under the finality doctrine, the Intervenors cannot seek review of the Biological Opinion or ERP because they have petitioned the Federal Defendants to amend or repeal the November Opinion and ERP. Second, the CMC and Federal Defendants contend the Opinion and ERP are not subject to the APA.

The APA governs federal agency "rule making," which is defined as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, to implement, interpret, or prescribe law or policy." *Id.* § 551(4). The APA's notice and comment requirements apply to rules, but not to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Neither the November Opinion nor the ERP meet the definition of a "rule"; thus, neither the Opinion nor the ERP are subject to the APA's notice and comment requirements.[16]

■ In analyzing whether an agency pronouncement is a substantive rule or policy statement, the Court must first look to the agency's own characterization of the pronouncement. *Professionals & Patients for Customized Care v. Shalala,* 56 F.3d 592, 596 (5th Cir.1995). When announcing the availability of the ERP, the Federal Defendants described the ERP as "a general statement of policy with respect to NMFS' enforcement practice and use of future rulemaking in response to elevated sea turtle strandings associated with shrimping effort." SAR A. 47; 60 Fed.Reg. 19885 (1995). In addition, the Federal Defendants have consistently maintained the position that the ERP establishes policy, not substantive rules. Thus, the agency's consistent approach to the ERP militates in favor of concluding that it is not a substantive rule. However, the agency's characterization of the pronouncement is not controlling. *Professionals & Patients,* 56 F.3d at 596.

■ Substantive rules, which require compliance with the APA notice and comment procedures, are rules that grant rights, impose obligations, or produce other significant effects on private interests. *United States v. Yuzary,* 55 F.3d 47, 51 (2nd Cir. 1995) (legislative rules create new law, rights, and duties, and impose distinct obligations on members of the public). The touchstone of a substantive rule is that establishes a binding norm. If the agency "remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." *Professionals & Patients,* 56 F.3d at 597–98 (quoting *Ryder Truck Lines, Inc. v. United States,*

**14.** In Count VII of its Complaint, the CMC alleges a violation of section 706(2) of the Administrative Procedure Act, which sets forth the standard for judicial review of agency action. Because the CMC has not alleged any substantive violation of the APA, the denial of the CMC's ESA and NEPA claims also amounts to a denial of any claim under the APA.

**15.** It is not entirely clear from the Intervenors' Complaint or their Motion for Summary Judg-

ment whether they are challenging the November Opinion and the ERP, or only the ERP. As a matter of caution, the Court will address both the Opinion and the ERP.

**16.** Because the Court agrees that the Biological Opinion and ERP are not subject to the APA, the Court does not consider whether the finality doctrine bars the Intervenors' challenge.

716 F.2d 1369, 1377 (11th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 181 (1984)).

 In contrast, interpretive rules, which the agency may adopt without complying with the APA's notice and comment procedures, are those which merely clarify existing law or regulations, and express the agency's intended course of action, its tentative view of the meaning of particular statutory terms, or internal housekeeping measures organizing agency activities. *American Ambulance Serv. of Pa., Inc. v. Sullivan,* 911 F.2d 901, 907 (3d Cir.1990); *American Hosp. Assoc. v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987); *Yuzary,* 55 F.3d at 51. Policy statements, likewise exempt from APA notice and comment procedures, announce the "motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a substantive question of regulation." *Professionals & Patients,* 56 F.3d at 601.

Clearly, neither the November Opinion nor the ERP are substantive rules under these standards. A biological opinion imposes no obligations on industry or members of the public who may be subject to the regulation of the agency; rather, it merely advises the public as to actions the agency may take in compliance with its ESA obligations. *See* 50 C.F.R. § 402.2; *National Wildlife Federation v. Coleman,* 529 F.2d 359, 371 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Swan View Coalition v. Turner,* 824 F.Supp. 923, 930 (D.Mont.1992). A biological opinion expresses the agency's view of its obligations under the ESA, and sets forth its intended policy with respect to those obligations. The opinion is not binding on agency, and the recommendations in a biological opinion are not self-executing—if the agency chooses to implement any of the recommendations, it must do so through rulemaking procedures in compliance with the APA.[17]

It is likewise clear that the ERP is not a substantive rule. The ERP is a general poli-

cy statement informing the public of the manner in which the Federal Defendants contemplate they will respond to any emergency levels of sea turtle strandings. The ERP does not bind the Federal Defendants to any particular course of action. Rather, the ERP expressly gives the Federal Defendants the discretion to consider the factual circumstances surrounding each incident of elevated stranding levels and to fashion their response accordingly. Because both the November Opinion and the ERP are properly characterized as interpretive rules or policy statements, neither was subject to the APA's notice and comment procedures. The Intervenors' Motion for Summary Judgment on Count I of their Complaint is therefore **DENIED,** and the Motions of the Federal Defendants and the CMC for Summary Judgment against Count I of the Intervenors' Complaint are therefore **GRANTED.**

### B. Count II: Emergency Gear Restrictions

 The emergency gear restrictions challenged by the Intervenors were published on May 3, 1995, and were effective from 12:01 a.m. on April 30, 1995, through 11:59 a.m. May 29, 1995. Because the restrictions expired by their own terms on May 29, 1995, the Federal Defendants contend the challenge to these restrictions is moot. *See, e.g., City of Houston v. FAA,* 679 F.2d 1184, 1199 (5th Cir.1982) (when an administrative order lapses by its own terms, a challenge to that order is moot). However, the restrictions were issued in accordance with the incidental take statement and the ERP in response to elevated sea turtle strandings. As the factual background of this case makes clear, strandings will likely reach emergency levels again, necessitating that the Federal Defendants take further action under the ERP and ITS. The emergency restrictions are in effect for such a short period of time that judicial review of whether the restrictions were properly imposed would be impossible to obtain before the restrictions expired. Accordingly, the Court concludes the Interve-

---

**17.** The Shrimp Industry Intervenors themselves even acknowledge this fact, stating "[a]ll parties now agree that a Biological Opinion, including the related incidental take statement and reason-

able and prudent alternative, is 'advisory' only and does not have the effect of law." Intervenors' Combined Reply at 3.

nors' challenge to the emergency restrictions is not moot. *See, e.g., Southern Pac. Terminal Co. v. Interstate Commerce Comm'n.,* 219 U.S. 498, 514–15, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown,* 948 F.2d 1436, 1447 (5th Cir.1991).

■■■ The Federal Defendants contend the emergency gear restrictions were properly issued pursuant to the "good cause" exceptions to the APA's requirements of prior notice and opportunity to comment. The Court agrees. Section 553(b)(3)(B) provides that an agency may dispense with notice of a proposed rulemaking "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest. 5. U.S.C. § 553(b)(3)(B). As to rules actually adopted by an agency, section 553(d)(3) requires publication of the rule at least 30 days before its effective date "unless otherwise provided by the agency for good cause found and published with the rule." [18] *Id.* at § 553(d)(3).

■■ The APA's good cause exceptions are generally treated as an emergency procedure. *See Northern Arapahoe Tribe v. Hodel,* 808 F.2d 741, 751 (10th Cir.1987); *Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 307 (9th Cir.1980). The exception should be narrowly construed because it is an "important safety valve to be used where delay would cause real harm." *United States Steel Corp. v. EPA,* 595 F.2d 207, 214 (5th Cir.1978), *clarified on other grounds,* 598 F.2d 915 (5th Cir.1979). Given the increased level of sea turtle strandings when the gear restrictions were implemented, an emergency clearly existed, and delaying the implementation of the restrictions would have been contrary to the public interest in protecting threatened and endangered species. *See Hodel,* 808 F.2d at 751 (good cause exception supported publication of hunting code that became effective immediately because the hunting season had already begun and studies indicated that in the absence of a hunting code, protected wildlife "could be reduced to a point where normal propagation and recovery will not occur.").

The Intervenors contend the good cause exception is inapplicable in this case because the Federal Defendants created the emergency themselves by not developing and publishing the ERP sooner. *See, e.g., National Assoc. of Farmworkers Orgs. v. Marshall,* 628 F.2d 604, 622 (D.C.Cir.1990) (where agency created the time pressures as a result of its own inaction, good cause exception does not excuse departure from normal rulemaking procedures); *accord Texas Food Indus. Ass'n. v. United States Dep't. of Agriculture,* 842 F.Supp. 254, 260 (W.D.Tex.1993). First, the Federal Defendants developed the ERP within the timeframe set forth in the November Opinion, and it is extremely unlikely that such a complex and well-reasoned policy could have been developed any sooner. More importantly, however, the emergency to which the Federal Defendants responded by way of the gear restrictions was the sharp increase in the level of sea turtle strandings, an emergency which the Federal Defendants in no way created. The gear restrictions were a proper response to a genuine emergency.

Moreover, the TED regulations, which were developed and adopted after full notice and comment, give the Federal Defendants the authority to take emergency actions when the need arises. 50 C.F.R. § 227.72(e)(6)(iii). Thus, the immediate implementation of the gear restrictions was consistent with the requirements of the Administrative Procedures Act and authorized by section 227.72(e). Accordingly, the Intervenors' Motion for Summary Judgment on Count II of the Shrimpers Action is **DENIED,** and the Motions of the Federal Defendants and the CMC for Summary Judgment against Count II are **GRANTED.**[19]

## V. CONCLUSION

The Court genuinely appreciates and even shares the CMC's concern for the future of

---

18. Each emergency restriction implemented by the Federal Defendants included the requisite good cause finding.

19. On November, Count III of the Intervenors Complaint was dismissed.

the sea turtles. It is an unfortunate reality of our modern world that where the interests of humans and the other creatures of the world clash, the human interests generally prevail. However, this Court has no ability to affect change in the policy decisions reflected in the Endangered Species Act and other legislation. That more could be done to protect the turtles is undeniable. However, this Court can only look to the actions of the Federal Defendants and determine whether the Defendants acted arbitrarily or capriciously in discharging their statutory obligations. The information before the Court demonstrates that the Federal Defendants are likewise genuinely concerned with the fate of the sea turtles, and have properly and conscientiously carried out their duties under the Endangered Species Act. The Court expects no less, and can require no more.

Therefore, for the reasons set forth above, the Federal Defendants' Motion for Summary Judgment in the CMC Action and the Shrimpers Action, the CMC's Motion for Summary Judgment against the Shrimpers Action, and the Intervenors' Motion for Summary Judgment against the CMC Action are hereby **GRANTED,** and all remaining Motions are hereby **DENIED.**

The Court sincerely appreciates the efforts of all counsel involved in this case. The briefs submitted by the parties were extremely helpful to the Court's resolution of the difficult issues presented by this case. The Court's decision was reached only after careful and searching review of the facts of the case and the arguments of the parties, and the Court believes there is no further relief it can provide. Therefore, without in any way attempting to limit the relief the parties may seek from other courts, the Court hereby directs the parties to file nothing further in this case in this Court, especially Motions to Reconsider or the like, unless they can present compelling and relevant new evidence or legal authority which they could not, through the exercise of due diligence, have presented upon the original submission of the summary judgment motions. Any and all further relief in this case shall be

sought in due course from the United States Court of Appeals for the Fifth Circuit.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Court's Order entered today, the Federal Defendants' Motion for Summary Judgment in the CMC Action and the Shrimpers Action, the CMC's Motion for Summary Judgment against the Shrimpers Action, and the Intervenors' Motion for Summary Judgment against the CMC Action are hereby **GRANTED,** and all remaining Motions are hereby **DENIED.** All parties are **ORDERED** to bear their own costs incurred herein to date.

**THIS IS A FINAL JUDGMENT.**