LOGGERHEAD TURTLE (Caretta caretta), Green Turtle (Chelonia mydas), Leatherback Turtle (Dermochelys coriacea), Shirley Reynolds and Rita Alexander, Plaintiffs,

v.

The COUNTY COUNCIL OF VOLUSIA COUNTY, FLORIDA, a political subdivision of the State of Florida and Bruce Babbitt, in his official capacity as Secretary of the United States Department of the Interior, an agency of the United States of America, Defendants.

No. 6:95CV587ORL22B.

United States District Court,
M.D. Florida,
Orlando Division.

May 17, 2000.

Peter J.B. Zies, Zies Brothers, P.A., Maitland, FL, Lesley Gay Blackner, Blackner, Stone & Assoc., Palm Beach, FL, for plaintiffs.

Jeffrey D. Keiner, John A. Kirst, Jr., Charles W. Sell, Theodore L. Shinkle, Russell S. Kent, Gray, Harris & Robinson, P.A., Orlando, FL, Jamie Ellen Seaman, Daniel D. Eckert, Volusia County Legal Department, Deland, FL, for The County Council of Volusia County, Florida, a political subdivision of the State of Florida, defendant.

Environmental Council of Volusia and Flagler Counties, Environmental Council of Volusia & Flagler Counties, R.P. Haviland, P.E., Daytona Beach, FL, movant pro se.

I. Randall Gold, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, Mark A. Brown, Wildlife & Marine Resources Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for Bruce Babbitt, in his official capacity as Secretary of the United States Department of the Interior, an agency of the United States of America, defendant.

## ORDER

CONWAY, District Judge.

The Court now considers the parties' cross-motions for summary judgment on all remaining issues in this action. Plaintiffs, the Loggerhead, Leatherback, and Green Sea Turtles, Shirley Reynolds, and Rita Alexander (collectively "the Plaintiffs"), seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, of the United States Fish and Wildlife Service's decision to issue an Incidental Take Permit to Volusia County in connection with vehicular beach driving and the agency's refusal to revoke the permit or reinitiate consultation as provided in the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* For the reasons that follow, the federal Defendant is entitled to summary judgment.

## I. Introduction.

Volusia County's residents and visitors share the county's beaches with endangered and threatened sea turtles. The residents and visitors use the beaches for living and recreational purposes. The sea turtles use the beaches for their seasonal nesting ground. These competing interests have created a somewhat inharmonious relationship between the humans and turtles.

The humans' use of the beach disturbs the sea turtles' nesting habits in at least two distinct ways. First, because beachfront living is at a premium in Volusia County, the shoreline has become highly developed. This development has created what some describe as an "urban glow," with artificial beachfront lighting illuminating the beach and surrounding sky. Sea turtles generally nest in the dark of night. They come ashore, deposit their eggs in the sand, and return to the ocean. When the hatchlings emerge, they instinctively depend on the moon's light to guide them seaward. Seduced by the artificial light, some hatchlings crawl toward land and perish from exhaustion, dehydration, or

predation. Studies also show that nesting females avoid areas where beachfront light is most intense, and abort nesting attempts at a greater frequency in lighted areas.

Second, in conjunction with sunbathing and recreational activities, Volusia County allows residents and visitors to drive their vehicles directly on the beaches. The throngs of beach goers, on foot and in cars, leave behind garbage and tire ruts, and generally disturb the natural condition of the beach and its sand. These conditions hinder the sea turtles' ability to find their way to the ocean, which is necessary for their survival.

Since these human-made hazards interrupt the sea turtles' nesting process, resulting in death to members of the species, the turtles often fall on the losing side of the battle over utilization of the beaches. Two things happened to improve the sea turtles' stance in the struggle over their natural nesting ground in Volusia County. First, in 1973, Congress passed powerful conservation legislation in an attempt to "halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Second, two Volusia County citizens, along with the turtles themselves, sued the County in 1995 in an effort to prevent humans from interfering with the turtles' nesting process. Five years of litigation has ensued. The following is an abbreviated version of the how the legal dispute has unfolded thus far.[1]

## II. Factual and Procedural History.

In June 1995, Plaintiffs, the Loggerhead and Green Sea Turtles, Shirley Reynolds, and Rita Alexander (collectively "the Plaintiffs") initiated this lawsuit against the County Council of Volusia County ("the County"). Empowered by the Endangered Species Act's citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), Plaintiffs sought declaratory and injunctive relief to protect sea turtles that nest and hatch on the County's beaches. In essence, Plaintiffs claimed that the County's refusal to ban beach driving and artificial beachfront lighting during sea turtle nesting season violated the Endangered Species Act. At the same time, Plaintiffs filed a motion for preliminary injunction to prevent vehicular access to the County's beaches during the sea turtle nesting season and to enjoin the County from permitting all artificial beachfront light sources that harm sea turtles.

On August 1, 1995, this Court preliminarily enjoined the County from allowing private vehicles to drive on the county's beaches from one hour before sunset until one hour after sunrise, and from permitting vehicles to drive and park within an established "conservation zone," which extended seaward from the dunes for a distance of thirty feet. *See Loggerhead Turtle v. County Council of Volusia County*, 896 F.Supp. 1170, 1181–1182 (M.D.Fla. 1995). The Court denied preliminary relief as to the artificial beachfront lighting issue. The Court declined to compel the County to enforce a different, stricter lighting ordinance, even with respect to those municipalities that had their own lighting ordinances by the County's permission.

Aware that vehicular access to its beaches resulted in the unlawful taking of turtles, in 1994, the County began working toward obtaining an "incidental take permit" or "ITP" from the United States Fish and Wildlife Service ("the Service" or "FWS") for the extent to which vehicular

---

1. Much of the background for the instant action is set forth in this Court's previous opinion, *Loggerhead Turtle v. County Council of Volusia County*, 896 F.Supp. 1170 (M.D.Fla. 1995), and a subsequent appeal, *Loggerhead Turtle v. Volusia County*, 148 F.3d 1231, 1249 (11th Cir.1998), *cert. denied*, 526 U.S. 1081, 119 S.Ct. 1488, 143 L.Ed.2d 570 (1999). For the reader's convenience, the Court will briefly recount the events which led to the instant challenge to the Secretary of the Interior's decision to allow Volusia County to "take" protected sea turtles incident to vehicular driving on the beach.

beach access would result in the incidental "take" [2] of sea turtles, their nests, eggs, or hatchlings.[3] The Endangered Species Act allows an entity to receive statutory permission from the Service to "take" a protected species—which the act normally prohibits—if the applicant meets the Act's requirements and the take is incidental to an otherwise lawful activity.

The Court will describe the ITP process in more detail below. Suffice it to say here that the County applied for the ITP and, on November 21, 1996, the Secretary issued it. The County subsequently moved this Court to dissolve the preliminary injunction and dismiss the action. Because the ITP allowed for a certain amount of takes due to vehicular driving, and incorporated a Beach Lighting Management Plan which addressed the harm caused by artificial beachfront lighting, the Court granted the motion. *See* Order of December 20, 1996 (Doc. 147).

Two issues presented on appeal were: 1) whether the incidental take permit exception to the ESA's "take" prohibition applies to in activity performed as a purely mitigatory measure upon which the Service conditioned the permit; and 2) whether the County's regulatory control of minimum wildlife protection standards can cause redressable injury to protected wildlife in locations where non-party municipalities under the County's control possess supplemental authority to regulate and/or exclusively control enforcement. *See Loggerhead Turtle v. Volusia County*, 148 F.3d 1231, 1249 (11th Cir.1998), *cert. denied*, 526 U.S. 1081, 119 S.Ct. 1488, 143 L.Ed.2d 570 (1999).

The Eleventh Circuit reversed the district court's opinions on both issues. First, the court ruled that the ITP does not give the County permission for any lighting-related takings, even though the ITP incorporates beach lighting mitigation measures.[4] Second, examining the Coun-

**2.** Congress defines the statutory term "take" to mean: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" has been defined by regulation as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *See* 50 C.F.R. § 17.3. "Harm" has been defined by regulation as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.*

**3.** The parties disagree as to when the County initiated its application for an incidental take permit. According to the Secretary, representatives of FWS, Volusia County, and the Florida Department of Environmental Protection ("FDEP") met in March 1994, when the County agreed to develop a sea turtle management plan, to train Beach Rangers on sea turtle conservation, and to secure an ITP. The Secretary recounts that during the following two and a half years, the Service aided the County in developing its HCP and Environmental Assessment ("EA"). During this time,

FWS provided information and technical assistance, commented on drafts, and offered assistance in building community support for the HCP. FWS actually received the County's HCP and permit application on February 9, 1996.

Plaintiffs take issue with this background information. They argue that the "[administrative record] demonstrates that Volusia County ... made no commitment to pursuing an ITP until the filing of plaintiffs' action in June 1995" and "the entire impetus behind the ITP was the County's goal to circumvent the instant action." [Pl.'s Opp. Mem., Doc. 225, at 3.] Plaintiffs expend two pages of their opposition memorandum attacking the Secretary's description of the pre-ITP process. Plaintiffs' objections are wasted on facts largely irrelevant. Pre–ITP events are not material to this action, which concerns only the Secretary's issuance and administration of the ITP. The impetus for the County's application matters not for purposes of this action. Moreover, the Court takes a dim view of any criticism of the County's attempt to comply with the law and avoid protracted litigation.

**4.** The Eleventh Circuit held that the ITP's protections extended only to those activities expressly authorized in the Permit (i.e. beach driving) and did not extend to activities ad-

ty's prior ordinance, the appellate court held that the Plaintiffs had standing "to seek to hold Volusia County liable" for beachfront lighting ordinances adopted by non-party municipalities under the county's direct regulatory control. The appellate court remanded for this Court to determine whether Volusia County's lighting ordinance violated the Endangered Species Act.

Before the Court could reach that decision, in June 1999, the County amended its lighting ordinances. The County's amendments essentially mooted the lighting issues on remand. Plaintiffs accordingly amended their complaint to challenge the new lighting ordinance and subsequently moved for another preliminary injunction as to it. In addition, dissatisfied with the promulgation, implementation, and administration of the HCP and ITP, Plaintiffs moved to amend their complaint to add as a Defendant Bruce Babbitt, in his official capacity as Secretary of the United States Department of the Interior (hereinafter "the Secretary"), who delegates decision-making authority to the Service.[5] Counts 2 through 5 of Plaintiffs' Second Amended Complaint are directed at the Service's actions concerning the County's incidental take permit. Plaintiff's assert the following claims: 1) FWS violated the ESA, § 10(a)(2)(A), by failing to ensure that the minimum criteria for the habitat conservation plan ("HCP") were satisfied; 2) FWS violated ESA § 10(a)(2)(B), by failing to incorporate the "best available science"

when it adopted certain measures designed to mitigate and minimize the impacts of incidental takings on turtles and by failing to ensure an adequate funding source for the measures; 3) FWS violated ESA, 10(a)(2)(C), by failing to revoke Volusia County's Permit even though the Service is aware of the County's non-compliance with the terms and conditions of the permit; and 4) FWS violated ESA, § 7(a)(2), by refusing to reinitiate consultation in light of "new information" presented after the permit's issuance.

By separate order, the Court denied Plaintiffs' application for preliminary injunction and granted the County's motion for summary judgment as to Count 1—the artificial beachfront lighting claim—which named only Volusia County as defendant. See Doc. 229. The Court now reaches Plaintiffs' complaint against the Secretary.[6] The Secretary filed a voluminous administrative record in support of its decision to grant the ITP and its subsequent actions in administering it.[7]

## III. Legal Framework.

 The instant action involves the interplay between the Endangered Species Act and the Administrative Procedure Act, which sets forth a method for judicial review of agency action. The Secretary's actions pursuant to the ESA are reviewed under the APA. See, e.g., Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Since the Court determines the issues based on the agency's

---

dressed by FWS as recommended mitigation measures (i.e. artificial lighting). The court reasoned that Volusia County did not have the Service's implied permission to "take" federally protected sea turtles incidentally through artificial beachfront lighting, based upon the County's implementation of mitigating measures specified in an incidental take permit for beach driving. Therefore, the Court concluded that the ESA and FWS regulations require incidental take permission to be express and activity-specific.

5. The Court will use the terms Service, FWS, and Secretary interchangeably when referring to the Secretary of the Interior and the United

States Fish and Wildlife Service. The Service has responsibility for regulating sea turtles when they come ashore to nest.

6. Both the County and the Secretary moved for summary judgment on Counts 2 through 5. The Court does not read Plaintiffs' Complaint to name the County in these counts, since they call for a review of the Secretary's actions. To the extent Plaintiffs seek any relief from the County in Counts 2 through 5, none is warranted under the analysis presented herein.

7. All citations to the administrative record will appear as "AR."

administrative record, a trial is generally unnecessary and summary judgment is often appropriate. *See Florida Fruit & Vegetable Assoc. v. Brock,* 771 F.2d 1455, 1459 (11th Cir.1985), *cert. denied,* 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986).[8]

## A. The Endangered Species Act.

The Endangered Species Act ("the ESA") vests the Secretary with the responsibility to determine whether a given species qualifies for designation as endangered or threatened. *See* 16 U.S.C. § 1533(a)(1). After a species has been placed on the endangered or threatened species list, Section 9 of the ESA makes it unlawful for any person subject to the jurisdiction of the United States to perform specified activities with regard to that species, including "taking" the species or violating any regulation pertaining to such species. *See* 16 U.S.C. § 1538(a)(1).

Section 10 of the ESA provides a limited exception to the prohibition against the "taking" of an endangered species. It allows the Secretary to issue an incidental take permit ("ITP") which authorizes the taking of some members of the protected species when such taking is "incidental" to carrying out an otherwise lawful activity. *See* 16 U.S.C. § 1539(a). The holder of such a permit is not liable for any taking that falls within the scope of the taking authorized by the Secretary. To obtain a permit, an applicant must develop and submit a "conservation plan" (commonly called a "Habitat Conservation Plan" or "HCP") which specifies (1) the likely impact from the taking; 2) the steps the applicant will take to minimize and mitigate such impacts and the funding available for such mitigation; 3) alternative actions considered and the reasons for not choosing

them; and 4) any other measures the Secretary may require as necessary or appropriate. *Id.* § 1539(a)(2)(A).

Upon submission of a completed application, a permit is issued if the Secretary finds, after opportunity for public comment, that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of survival and recovery of the species in the wild; and (v) other required measures will be met. *See* 16 U.S.C. § 1539(a)(2)(B). The permit shall "contain such terms and conditions as the Secretary deems necessary or appropriate ... including, but not limited to, such reporting requirements as the Secretary deems necessary for determining whether such terms and conditions are being complied with." *Id.* The Secretary shall revoke the permit if he finds that the permittee is not complying with the terms and conditions of the permit. *Id.* § 1539(a)(2)(C).

In addition to reviewing the permit application for compliance with the issuance criteria of § 10, the FWS must ensure that issuance of the permit is consistent with ESA § 7(a)(2). *See* 16 U.S.C. § 1536(a)(2). After a species is listed as threatened or endangered, § 7 requires each federal agency to "insure that any action authorized, funded, or carried out by an agency ... is not likely to jeopardize the continued existence of any endangered or threatened species[9] or result in the destruction or adverse modification of [critical] habitat." § 1536(a)(2). To comply with this dictate, an action agency is required to participate in a consultation process with

---

**8.** Despite Plaintiffs' counsel's arguments to the contrary, a Court may hold a trial in a case brought under the Administrative Procedure Act when circumstances warrant such a course of action. *See, e.g., Sierra Club v. Peterson,* 185 F.3d 349, 368 (5th Cir.1999).

**9.** To jeopardize the continued existence of a species is to engage in an action that would be expected, either directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing its reproduction, numbers, or distribution. *See* 50 C.F.R. § 402.02.

the FWS. These consultation and no-jeopardy requirements also apply to the FWS when it authorizes action through an ITP. Accordingly, the Service must consult internally with itself (commonly referred to as "self-consultation") and meet the "not likely to jeopardize" standard provided in § 7. The agency must "use the best scientific and commercial data available" when it performs this required consultation. *Id.*

Under ESA regulations, certain circumstances may trigger an agency's need to consult again on the same project or the later operation or management of the project. Reinitiation of consultation is required where discretionary federal involvement or control over the action has been retained or is authorized by law and if a) the extent of the level of take in the ITP is exceeded; b) new information reveals that the action may affect the species or critical habitat in a way or to an extent not previously considered; c) the action is modified causing effects to the species or critical habitat not considered in the biological opinion; or d) a new species is listed or critical habitat designated that may be affected. 50 C.F.R. § 402.16.

### B. Administrative Procedure Act.

Judicial review of administrative actions, including those involving the ESA, is governed by § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See Fund for Animals v. Rice*, 85 F.3d 535, 541–42 (11th Cir.1996). The APA authorizes a court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The APA also provides that a court shall compel agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

The scope of review under the APA's arbitrary and capricious standard is narrow, and a court may not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. 2856. To this end, a reviewing court may not set aside an agency rule that is rational, based on consideration of relevant factors, and within the scope of the authority delegated to the agency by the statute. *Id.* at 42–43, 103 S.Ct. 2856. The Court's only task is to determine whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made. *Bowman Transportation v. Arkansas–Best Freight System*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

In applying the arbitrary and capricious standard, a reviewing court must give the agency action substantial deference. *See Fund for Animals*, 85 F.3d at 541–42. Where, as here, an agency's special scientific expertise is involved, the Court must be "most deferential." *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). In addition, the Secretary's choices are entitled to a "presumption of regularity." *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. 814.

In an APA case, the factfinding capacity of the district court is typically unnecessary. The Court is to decide, on the basis of the record the agency provides, whether the actions pass muster under the appropriate APA standard of review. *See Preserve Endangered Areas of Cobb's History, Inc. ("PEACH") v. U.S Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir.1996).

### C. Summary Judgment Standard.

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995)). Summary judgment is appropriate where, like in the instant action, a court is asked to review a decision of a federal administrative agency. *See Florida Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir.1985). Plaintiffs bear the burden of showing that the Secretary has violated the applicable provisions of the ESA and APA.

### IV. The ITP process.

Before the Service may issue an ITP, an applicant must submit a "conservation plan," commonly referred to as a Habitat Conservation Plan ("HCP"). The HCP must specify (1) the likely impact from the taking; 2) the steps the applicant will take to minimize and mitigate such impacts and the funding available for such mitigation; 3) alternative actions considered and the reasons for not choosing them; and 4) any other measures the Secretary may require as necessary or appropriate. *Id.* § 1539(a)(2)(A).

The County's HCP, at issue here, is intended to provide an ecosystem approach to management of the beach. It is designed to protect several species of feder-ally endangered or threatened sea turtles, including the loggerhead, green, leatherback, hawksbill and Kemp's ridley.[10] In approving the County's HCP and subsequently issuing a permit, the Service drafted a Biological Opinion [AR 60.1] and made required Findings [AR 60.3]. The HCP, Biological Opinion, and Findings are discussed below.

### A. HCP.

The County's HCP establishes a five-year comprehensive beach management plan designed to protect state and federally listed species while allowing continued vehicular access to county beaches. *See* HCP at 2–1. The HCP divides the County's beaches into three areas: Natural Beach areas where driving is prohibited, Transition Areas in which a 30 foot no-driving conservation zone is established, and Urban Areas, in which a 15 foot no-driving conservation zone is established.

The County submitted its draft HCP to the Service in July 1995. In the months that followed, the County and Service worked together to improve the HCP and to garner support for it within the community. By the end of 1995, the County submitted a proposed draft of the HCP and Environmental Assessment (EA) to the Service for comments. [AR 60.1 at 4.] Subsequently, the Service assumed responsibility for completing the EA pursuant to the National Environmental Policy Act. *Id.* After two more drafts, the County submitted its completed HCP to the Service.

In March 1996, the Service published a Notice of Availability of the HCP in the *Federal Register.* [AR 60.7.] The Service received 115 comment letters during the official 30–day comment period and provided the comments to the County. [AR 60.1 at 4–5.] Between May and November 1996, the County addressed the comments

---

**10.** The HCP protects other species, including the Southeastern beach mouse, the Gopher tortoise, and numerous bird species. Table–1 of the HCP lists all of the covered species.

by providing responses and making desired changes to the HCP.[11]

As part of its HCP, the County proposed to 1) reduce general public vehicular access to beaches under its jurisdiction by an additional 8.98 miles;[12] 2) establish conservation zones adjacent to the dunes in the Urban and Transitional areas of the beach in which vehicular access is prohibited; 3) remove public vehicular access to County beaches at night; and 4) continue a beach management program, including vehicle rut removal, trash removal, and maintenance programs tailored for sea protection. [AR 60.1 at 6–7.]

In addition, the County proposed to mitigate impacts to listed species by: 1) establishing a program to monitor, manage, and study sea turtles and other protected species; 2) hiring a professional Protected Species Specialist (PSS) for management of sea turtles and the establishment of a comprehensive program to educate County staff, the general public, and the private tourism sector concerning conservation efforts on the beach; 3) establishing a formalized cooperative effort with the Service and the FDEP to develop an ongoing protected species monitoring program and a formalized method of developing short- and long-range management considerations; 4) establishing a Beach Lighting Management Plan to address methods for correcting lights not owned or operated by Volusia County so that they will not be hazardous to sea turtles; 5) correcting any lights owned and operated by Volusia County deemed to be a problem for sea turtles; and 6) increasing enforcement efforts for the existing Volusia County Lighting Ordinance. [AR 60.1 at 7.]

### B. Biological Opinion.

After a species is listed as threatened or endangered, § 7 of the ESA requires that each federal agency "insure that any action authorized, funded, or carried out by an agency ... is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [critical] habitat." *Id.* The Service has found that, "human activities that affect the behavior and/or survivability of turtles on their remaining nesting beaches, particularly the few remaining high density nesting beaches, could seriously reduce [the] ability to conserve sea turtles." [AR 60.1 at 8.] The Service recognizes several human-caused mortality factors which have contributed to the decline of sea turtle populations along the Atlantic Coast and in the Gulf of Mexico. One factor present in this case is the degradation of the turtles' nesting habitat by coastal development.

Supported by extensive literature, the Service's Biological Opinion 1) examines the status of the species of the Loggerhead, Green, and Leatherback sea turtles generally and in Volusia County; 2) evaluates the effects of the County's proposed actions on these species; and 3) contains an Incidental Take Statement. The Biological Opinion reveals the following:

### 1. Status of the plaintiff species.

The Loggerhead sea turtle, *Caretta Caretta*, was listed as a threatened species on July 28, 1978. It inhabits the continental shelves and estuarine environments along the margins of the Atlantic, Pacific, and Indian Oceans. The loggerhead nest within the continental United States from Louisiana to Virginia. Major nesting concentrations are found on the coastal islands of North Carolina, South Carolina, and Georgia, and on the Atlantic and Gulf coasts of Florida. From a global perspective, the southeastern United States nesting aggre-

---

**11.** For example, the County requested that the Service require, as a special condition of its permit, that the County modify any County-owned or -controlled lights deemed to pose a problem for sea turtles, and to bring them into compliance with FDEP guidelines. The Service agreed to incorporate this feature into the ITP. [AR 60.1 at 5.]

**12.** The additional area represents those sections of the beach with the highest average sea turtle nest densities.

gation is of paramount importance to the survival of the species and is second in size only to those turtles which nest on islands of the Arabian Sea off Oman. About eighty percent of loggerhead nesting in the southeastern United States occurs in six Florida counties: Brevard, Indian River, St. Lucie, Martin, Palm Beach, and Broward. [AR 60.1 at 8.] In Volusia County, loggerhead turtles usually nest from late April or early May through mid-September. The County hosts approximately 2.8 percent of all loggerhead turtle nesting in Florida.[13]

The endangered Green sea turtle, *Chelonia mydas*, was listed under the Act on July 28, 1978. Breeding populations of the green turtle in Florida and along the Pacific coast of Mexico are listed as endangered; all other populations are listed as threatened.[14] Within the United States, green turtles nest in small numbers in the United States Virgin Islands and Puerto Rico, and in larger numbers along the east coast of Florida, particularly in Brevard, Indian River, St. Lucie, Martin, Palm Beach, and Broward Counties. The number of egg clutches deposited by green turtles in Florida was 736 in 1985, 350 in 1986, 866 in 1987, 466 in 1988, 559 in 1989, and 2,228 in 1990.

In Volusia County, green turtles usually nest from late May or early June to early or mid-September. The County is the site of approximately 3 percent of all green turtle nesting in Florida. From 1988 through 1994, annual green turtle nest production in Volusia County varied from 14 to 115 nests.

The Leatherback sea turtle, *Demochelys coriacea*, listed as an endangered species on June 2, 1970, is found in the Atlantic, Pacific, and Indian Oceans. Nesting grounds are distributed circumglobally, with the Pacific Coast of Mexico supporting the world's largest known concentration of nesting leatherbacks. The leatherback regularly nests in the United States in Puerto Rico, the United States Virgin Islands, along the Atlantic coast of Florida, and as far north as Georgia. Leatherback nesting in Florida was once considered extremely rare. Later data suggests that the species emerges regularly to nest on the beaches of the south Atlantic coast of Florida. Between 1981 and 1990, 38 to 125 leatherback nests on Florida beaches were reported annually.[15] Although no population estimate is available for the leatherback population in the United States, some researchers believe that 16 to 31 individual female leatherbacks nest annually in Florida. [AR 60.1 at 13–14.] According to the Service, nesting by leatherback turtles is rare in Volusia County, with an average of one nest per year. The EA presents nesting data for the period of 1988 through 1994, and nesting activity for the years 1993 and 1994 by region.

**2. Summary of the status of marine sea turtles in Volusia County.**

The total extent of sea turtle nesting on all of Volusia County's beaches account for 2.8 percent of all loggerhead, 3 percent of all green, and less than 1 percent of all leatherback. From these small percentages of total nesting, the Service concluded that Volusia's coastline is not considered a critically important or essential nesting area for any of the species at issue. [AR 60.1 at 17.] Although the Service recognized that sea turtles will nest within the geographic extent of Volusia County's beaches, it nevertheless concluded that the total number of turtle nests found in the County are insignificant in relation to the recovery and survival of the species. *Id.*

---

13. The EA contains a summary of the County's annual loggerhead nesting data from 1988 to 1994.

14. Major green turtle nesting colonies in the Atlantic occur on Ascension Island, Aves Island, Costa Rica, and Surinam.

15. *See* AR 60.1 at 12–13 (citing Recovery Plan for Leatherback turtles in the U.S. Caribbean, Atlantic, and Gulf of Mexico (National Marine Fisheries Service and U.S. Fish and Wildlife Service 1992)).

### 3. Effects of the proposed action on sea turtles.

Under Section 7(a)(2) of the ESA, when the Service studies the effects of agency action, it must examine direct and indirect effects [16] on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action.[17] As noted above, the action upon which the ITP is premised is Volusia County's desire to grant limited public vehicular access to the its beaches for 1) public recreation; 2) County-related public safety and maintenance operations; and 3) Wildlife Protection Vehicles which traverse the beaches to perform daily nest markings and other duties associated with the implementation of the HCP and ITP. [AR 60.1 at 17.]

The "action area" for evaluating the direct, indirect, and cumulative effects of vehicular driving extends from the northern Volusia County line to the southern line. The east and west limits were taken from the definition of "beach" as used in the Volusia County ordinances. The beach is defined as the area between the mean low tide mark and the seaward edge of the first permanent vegetation zone on the dunes or seawall, whichever is closer to the Atlantic Ocean. The Service refers to this area as the "Defined Area."

The Service anticipates that the majority of direct and indirect effects of vehicular access to the beach on sea turtles, their nests, eggs, and hatchlings will occur primarily during sea turtle nesting season from May 1 through October 31 and during summer and fall storm events through November 30, when post-hatchlings may wash ashore. Within the scope of its consultation, the Service considered vehicle-related categories which have a likelihood of causing injury and/or death to sea turtles. These include 1) vehicular collisions;[18] 2) vehicular lights; 3) tire ruts; 4) sand compaction; and 5) beach maintenance. *Id.* at 17–18. The Service also considered the cumulative effects of future State,[19] local, or private action that might occur in the action area.[20]

Upon examination, the Service concluded that little or no information suggests that the above-listed mortality factors would significantly adversely affect the sea turtle populations within the Defined Area. According to the Service, "the likelihood of a mortality or injury event occurring from any of the described actions was remote." *Id.* at 32. The Service opined that the HCP's minimization and mitigation measures would further reduce the potential for incidental vehicular takes, including implementation of the Beach Lighting Management Plan, enhanced enforcement of the existing County Lighting Ordinance, and bringing County-owned and operated lights into compliance with state guidelines. *Id.*

After considering the current status of the relevant sea turtles species, the environmental baseline for the action area, and

**16.** Indirect effects are those caused by the proposed action and occur later in time, but are still reasonably certain to occur. *See* 50 C.F.R. § 402.02.

**17.** The Service has determined that there are no interrelated or interdependent actions apart from the action under consideration. [AR 60.1 at 17.]

**18.** With respect to collisions, the Service considered the effects of: 1) vehicles altering adult nesting behavior or colliding with an adult turtle at night; 2) vehicles altering adult nesting behavior or colliding with adults during the day; 3) collisions between vehicles and hatchlings during the day; 4) collisions between vehicles and hatchlings during the night; 5) collisions between vehicles and strandings of live or weakened adults and post-hatchling "wash-backs;" and 6) vehicles running over missed nests.

**19.** For example, the Service evaluated what, if any, effects to the sea turtles would result from the FDEP issuing the County a permit for a coastal armoring project. [AR 60.1 at 30.]

**20.** The Service did not consider any future federal actions unrelated to the proposed action because they require separate consultation under Section 7.

the direct, indirect, and cumulative effects of the proposed action within the action area, in context to the rangewide status of the species, the Service reached a Biological Opinion that the proposed issuance of the County's ITP is not likely to jeopardize the continued existence of the loggerhead, green, or leatherback turtles, and is not likely to destroy or adversely modify designated critical habitat. Since no critical habitat had been designated for the loggerhead or green turtles, the Service naturally concluded that none will be affected. As for the leatherback, only St. Croix and the U.S. Virgin Islands were designated as critical habitats; thus, the Service concluded that the proposed action would not affect those areas and no destruction or adverse modification of that critical habitat was anticipated.

#### 4. Incidental Take Statement

Sections 4(d) and 9 of the ESA prohibit taking of listed species of fish or wildlife without a special exemption. In its take statement, the Service listed eleven types of incidental takes it anticipates based on the harmful conduct listed above. [AR 60.1 at 33–34.] Based on the conditions of the ITP, the Service concluded that the County's HCP incorporates all the measures necessary to minimize and mitigate take of sea turtles by the proposed action.

#### C. The Service's Findings and the Incidental Take Permit.

The Service issued its Biological Opinion and Findings contemporaneously with the Incidental Take Permit on November 21, 1996. The Findings address each of the

§ 10(a)(2)(B) requirements for issuing the Permit, and public comments are attached. [AR 60.3.] The Permit is conditioned upon annual approval of the County's HCP Operational Budget, which must provide an itemized financial commitment that will fund all the terms and conditions of the HCP and the Permit. [AR 60.5 at 24.] Section G of the ITP describes those activities which "will be employed" by the County to "ensure that take is minimized and mitigated." Among the fifteen categories of mitigation activities is a provision for a "Beach Lighting Management Plan."[21] In addition, the Permit requires the County, in conjunction with the Service, to conduct lighting surveys at least monthly during sea turtle nesting season; to provide light management training through workshops and manuals; and to bring all County-controlled lights into compliance, with verification by FWS.

The Permit's enforcement section provides that: 1) FWS will make unannounced beach visits to assess Permit compliance; 2) the County will correct any problems with Beach Services personnel within two weeks of notification by FWS; and 3) the County will collect information on its enforcement actions and provide it to FWS upon request. [AR 60.5 at 22.] The Permit has been re-issued with minor modifications three times in 1997, 1998, and 1999. [AR 60.6, 60.12, 60.13.] The Permit expires on December 31, 2001.

### V. Analysis.

In discussing the power Congress entrusted to the Secretary to interpret and

---

**21.** With respect to lighting, the Permit calls for the County to:
 a. identify the jurisdictional boundaries;
 b. categorize the lighting environments;
 c. determine the adequacy of existing ordinances and codes within each jurisdiction and the related enforcement;
 d. develop an approach for addressing lighting issues for each coastal lighting category;
 e. evaluate the coastline to determine where lighting modifications are feasible and cost effective;
 f. coordinate implementation of lighting ordinances (if cost effective) in currently exempt municipalities;
 g. develop a program to assist coastal property owner to comply with lighting guidelines;
 h. develop a public awareness program to promote turtle-friendly lighting;
 i. develop a long-term maintenance program.
 *Id.*

apply provisions of the Endangered Species Act, the Supreme Court has said the following:

> When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary. *See* 16 U.S.C. §§ 1533, 1540(f). The task of defining and listing endangered and threatened species requires an expertise and attention to detail that exceeds the normal province of Congress. Fashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion.... When Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his....
>
> In the elaboration and enforcement of the ESA, the Secretary and all persons who must comply with the law will confront difficult questions of proximity and degree; for, as all recognize, the Act encompasses a vast range of economic and social enterprises and endeavors. These questions must be addressed in the usual course of the law, through case-by-case resolution and adjudication.

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 708, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (citations omitted). Thus, the Supreme Court expressly recognized that the ESA vests broad discretion in the Secretary to issue incidental take permits.

Section 9(a) of the ESA requires the Secretary to follow defined steps before issuing an incidental take permit.[22] Plaintiffs assert in Counts 2 and 3 of their Second Amended Complaint that the Service acted in an arbitrary and capricious fashion, in violation of the APA, when it issued the ITP. Count 4 asserts that the Service violated the ESA, 16 U.S.C. § 1539(a)(2)(C) by failing to revoke the ITP. Finally, Count 5 asserts that the Service is acting improperly by refusing to

reinitiate consultation of the permit under Section 7 of the ESA, 16 U.S.C. § 1536(a).

**A. The Secretary properly issued the County's ITP.**

Plaintiff first contends that, in approving the HCP and issuing the ITP, the Service failed to ensure that the HCP satisfied the minimum criteria under § 1539(a)(2)(A)(i)–(iv) and 50 C.F.R. §§ 17.22(b)(1) and 17.32(b)(1). This contention is without merit. The Service set forth evidence in the administrative record that it assisted the County in the preparation of the EA and HCP by providing procedural information and direction so that the resulting analysis would be based on a complete review of all the available sea turtle nesting research and would provide the scientific basis for the ITP's conditions. It is evident that the HCP provides a thorough analysis of the human activities likely to harm the greatest numbers of sea turtles [AR 60.4 at 5–2 to 5–9]; details the proposed measures to minimize and mitigate any incidental takes [AR 60.4 at E6–E10]; and presents considered alternatives [AR 60.4 at E5–E6]. In short, the County's HCP specifies the required information under the statute. Plaintiffs' disagreement with the HCP's underpinnings is not relevant to the instant analysis.

Plaintiffs next argue that the Service's approval of certain conditions of the ITP was arbitrary and capricious because the record contains no explanation as to why the conditions minimize or mitigate harm to sea turtles to the "maximum extent practicable," as required by § 1539(a)(2)(B)(ii). The permit contains several minimization and mitigation factors. For example, the Permit is designed to 'minimize' the impact to the sea turtles by, among other things, reducing the total area in which vehicles are allowed to drive on the beach, reducing the times of day when vehicles are allowed on the beach, and restricting commercial fishermen and

---

**22.** These steps are set forth in Part III.A, above.

concessionaires. . The Permit attempts to "mitigate" harm by incorporating a "Beach Lighting Management Plan." [AR 60.5.]

Plaintiffs spend considerable time attacking virtually every mitigating and minimizing measure the ITP incorporates, and equally assailing the Service's finding that the proposed measures mitigate or minimize harm to the "maximum extent practicable." The Service's choice of measures was informed by the Endangered Species Habitat Conservation Planning Handbook, published jointly by the FWS and the National Marine Fisheries Service. According to the Secretary, the Handbook provides guidance to potential applicants on preparing ITP applications and to agency personnel on how to evaluate the applications. The Handbook explains the "maximum extent practicable" standard as follows:

> This finding typically requires consideration of two factors: adequacy of the minimization and mitigation program, and whether it is the maximum that can practically be implemented by the applicant. To the extent that the minimization and mitigation program can be demonstrated to provide substantial benefits to the species, less emphasis can be placed on the second factor.

HCP Handbook at 7-3.

In its extensive Biological Opinion [AR 60.1] and Set of Findings [AR 60.3], the Service addressed the basis for its judgment as to the minimization and mitigation measures that provide protection and that are also practicable. It is clear that the Service's choices of mitigating measures are aimed at providing sea turtle protection where it is needed most, and maintaining "conservation, social and economic beach values." [AR 60.3 at 18.] The record demonstrates the beneficial effects of the vehicle reduction program and BLMP.

In Volusia County, much of the area near the beach is highly developed, and the beach is heavily used for recreational purposes, including driving. [AR 60.2 at 3–20.][23] The Service asserts that the economic and community impacts of even some reduction in beach usage in Volusia County is well-documented in the record. [AR 57.16; 60.2 at 3–20 to 3–24.] Thus, the Service argues, closing the beaches entirely during the spring and summer months is patently impracticable. Here, the mitigation factors chosen are aimed at reducing existing land uses and their impacts and increasing the value of the beaches as a habitat. The final decision as to the practicability of proposed measures rests with the Service, and its decision is entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Fund for Animals v. Rice,* 85 F.3d 535, 541–42 (11th Cir.1996).

With respect to the Beach Lighting Management Plan (BLMP), it was included in the Permit as a mitigating measure for beach driving. While the Permit only allows takes incidental to beach driving, the restriction of beach lighting serves to reduce or mitigate the permitted loss of sea turtles by reducing other causes of loss-namely artificial beach lighting. [AR 60.5 at 2–3.] Plaintiffs attack this mitigation measure as insufficient because, they argue, the discretion regarding the adequacy of existing lighting codes and enforcement remains vested squarely with the County. On the contrary, the Permit mandates that the standards in the BLMP be approved by FWS. [AR 60.5 at 13.]

Plaintiffs also argue that the BLMP measure is inadequate because it relies on the "speculative future action by others." *Sierra Club v. Babbitt,* 15 F.Supp.2d 1274 (S.D.Ala.1998). Plaintiffs' reliance on *Si-*

**23.** A 1994 "Strategic Action Plan for Tourism in Volusia County" found that "[t]he beach is central to the economy of Volusia County." *Id.* The study noted that the primary reason people visit Daytona Beach is for the beach itself. Moreover, surveys of activities and attractions that draw visitors to the area cited "driving on the beach" as the primary draw for in-state visitors and the secondary attraction for out-of-state visitors. *Id.*

erra *Club* is misplaced. The permit at issue there relied on "unnamed sources to contribute funds to make up for the inadequacy of the amounts of offsite mitigation funding required …" under the permit. *Id.* at 1282. These "unnamed sources" were neither parties to the permit, nor were they under any obligation to comply with it. Here, the County, as applicant for the permit, was required to develop a BLMP acceptable to the FWS and then fully implement the plan in order to obtain the ITP's advantages.

 Plaintiffs argue that the Permit provision which requires the County to appropriate funds annually for the HCP and Permit compliance is arbitrary and capricious and that FWS does not have the discretion to condition the ITP on future appropriations. Plaintiffs arguments are misguided. The ESA requires "adequate funding" for Permit approval. *See* 16 U.S.C. § 1539(a)(2)(B)(iii). The statute speaks in terms of future action: the Secretary must be satisfied that the applicant *will* ensure that adequate funding for the plan *will* be provided. *Id.* The Secretary made this requisite finding based on its opportunity during the HCP's development to observe the County's commitment to funding the HCP's contemplated programs. Moreover, the Permit is conditioned upon the Service's approval of County's budget allocations. [AR 60.5 at 24.] Plaintiffs simply have presented no evidence that the Service's decision to accept the County's annual budgeting and appropriation as "adequate funding" was not reasonable.

 Plaintiffs contend that many of the Permit terms and conditions cannot be considered minimization or mitigation measures because they were allegedly "on the books" before the Permit was issued. This argument borders on the absurd. Plaintiffs have presented no legal authority which would prevent the County from memorializing pre-existing measures in the Permit, especially those that were initiated in anticipation thereof. Plaintiffs call it "nonsensical" to give the County "credit for complying with laws it is already obligated to comply with …" As the Service aptly responds, it would be "nonsensical" to penalize the County for aggressively moving forward with its conservation program under the Service's supervision.

The Secretary correctly argues that administrative decisions under the APA and ESA are controlled by the deferential review standard set forth in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Although the standard does not shield agency decisions from a thorough review, there is still "a presumption of regularity." *Id.* at 415, 91 S.Ct. 814. In order to find that the challenged decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Court must consider, based on the administrative record, whether the decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814. If the Court finds that the agency, in view of the administrative record as a whole, has considered the relevant factors and articulated a rational connection between the facts found and the Secretary's decision, there is no violation of the ESA or APA. *See, e.g., Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 982 (9th Cir.1985).

Plaintiffs have raised so many criticisms of the ITP that it would be impossible to discuss all of them here. For every point the Plaintiff raises, the Service presents a counterpoint in the record. The Court cannot allow itself to become bogged down in the minutiae of each of the permit's measures. Plaintiffs must bear in mind that an "agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir.1988) (concerning shrimp-

ing regulation to reduce sea turtle mortality).

■■■■■ Plaintiffs primarily lament the Service's refusal to adopt *their* list of measures in issuing the ITP. However, as Plaintiffs concede, the choice of minimization and mitigation measures lies within the Secretary's discretion. *See, e.g., Center for Marine Conservation v. Brown,* 917 F.Supp. 1128, 1150 (S.D.Tex.1996). The Service is not required to select all available measures or even the best measures. Rather, it must select measures that minimize and mitigate impacts to the maximum extent practicable. *See Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir. 1998). The Service's selection is entitled to deference due to its biological expertise. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "Plaintiff[s] may quibble with the science employed in the issuance of the permit, but this disagreement cannot, in light of the agency's care, raise an issue as to the agency's procedure in evaluating and reviewing the data before it." *Friends of Endangered Species, Inc. v. Jantzen,* 589 F.Supp. 113, 119 (N.D.Cal.1984), *aff'd,* 760 F.2d 976 (9th Cir.1985).

The administrative record demonstrates that, before granting the permit, the Service made each of the required statutory findings that 1) the take would be incidental; 2) the County would minimize and mitigate the impacts of any takes and ensure funding; and 3) the incidental takes would not "appreciably reduce the likelihood of the survival and recovery of the species in the wild." See 16 U.S.C. § 1539(a)(2)(B); AR 60.3. The record provides a rational basis for each of these findings. That is all the law requires.

**B. The Secretary considered the required data.[24]**

■■■■ Plaintiffs assert that FWS failed to "incorporate the best available science regarding appropriate minimization and mitigation for sea turtles...." when it concluded that the HCP minimized and mitigated the impacts of the takings of sea turtles to the maximum extent practicable. [Sec.Am.Compl. § 43.] The Secretary agrees that its findings must rely on the "best available scientific and commercial data." *See* 16 U.S.C. § 1536(a)(2). To this end, the administrative record clearly shows that the Service possessed and considered a vast array of scientific study and data from trained observers. Significantly, the Plaintiffs provided additional information during the permitting process. The Biological Opinion [AR 60.1] and the Findings [AR 60.3] show that the Service considered extensive literature and public comments.

Plaintiffs apparently misunderstand the Secretary's obligation under the statute. For example, Plaintiffs challenge the Service's contention that it considered all the available literature and public comments by arguing that "[n]o fewer than 12 sea turtle biologists commented on the HCP; not one of them endorsed the 15 foot conservation zone in the urban areas and the 30 foot conservation zones in the transitional areas as adequate to minimize and mitigate harm to sea turtles to the maximum extent practicable." *See* Doc. 225 at 9. This argument reveals Plaintiffs' belief that the Service must accept, utilize, and

---

**24.** As an initial matter, the Court questions whether "the best scientific and commercial data available" requirement applies to the Secretary's obligation, under § 1539(a)(2)(B)(ii), to ensure that an ITP applicant will, to the maximum extent practicable, minimize and mitigate the impacts of a proposed taking. The requirement clearly applies to no-jeopardy consultations between an agency and the Secretary under 16 U.S.C.

§ 1536(a)(2) and the Secretary's listing determinations pursuant to 16 U.S.C. § 1533(b)(1)(A). To the extent "the best scientific and commercial data available" requirement does not apply to § 1539(a)(2)(B)(ii), Plaintiffs are entitled to no relief on this claim for that reason. Since no party raised this issue, however, the Court will proceed with its analysis assuming, but not deciding, that the standard does apply.

incorporate all of the best available data into each of its decisions. There is simply no authority for the proposition that the Secretary is required to do anything more than consider the data when reaching his decisions.

Where there is a substantial volume of research, data, and comments, the agency exercises its expertise to make a reasonable decision based on all of the data and information.

In *Bennett v. Spear*, the Court explained the § 1536(a)(2) directive as follows:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives. That economic consequences are an explicit concern of the ESA is evidenced by § 1536(h), which provides exemption from § 1536(a)(2)'s no-jeopardy mandate where there are no reasonable and prudent alternatives to the agency action and the benefits of the agency action clearly outweigh the benefits of any alternatives. We believe the "best scientific and commercial data" provision is similarly intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations.

*Bennett*, 520 U.S. at 176–177, 117 S.Ct. 1154.

■■■ "When specialists express conflicting views, an agency must have discretion to rely upon reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *New Mexico Cattle Growers Assoc. v. Fish*

*and Wildlife Service*, 81 F.Supp.2d 1141, 1160 (D.N.M.1999). Plaintiffs' disagreement with the Service's ultimate findings or the studies underlying them does not render its decisions arbitrary and capricious. Ultimately, Plaintiffs fail to demonstrate that the Secretary's decisions were not informed by the required data.

## C. The Secretary did not violate the ESA by not revoking the ITP.

Plaintiffs claim that the Secretary violated the ESA by failing to revoke the permit for the County's non-compliance. Plaintiffs allege that they informed the FWS of permit violations, and FWS failed to revoke the permit. [Sec.Amend.Compl. ¶¶ 48–50.]

■■■ The ESA provides that "[t]he Secretary shall revoke a [§ 10] permit ... if he finds that the permittee is not complying with the terms and conditions of the permit." 16 U.S.C. § 1539(a)(2)(C). Contrary to Plaintiffs' apparent belief, notice of an alleged violation does not automatically trigger mandatory revocation. The Secretary must first make a finding of non-compliance. Neither the Plaintiffs nor the record presents evidence that the Secretary made such a finding. The Secretary states that the Service has never made such a finding.

Each party cites *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), in support of its position on revocation. There, the Supreme Court found that revocation decisions are entrusted to agency discretion. The Court observed that:

> the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, ... whether the particular enforcement action requested best fits the agency's overall policies.... An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than

the courts to deal with the many variables involved in the proper ordering of its priorities.

*Heckler,* 470 U.S. at 831–32, 105 S.Ct. 1649. Courts have held in other contexts that permit revocation is committed to the Secretary's discretion and entitled to deference by the reviewing court. *Compare Harmon Cove Condominium Assoc. Inc. v. Marsh,* 815 F.2d 949, 953 (3rd Cir.1987) (Federal Water Pollution Control Act permit enforcement discretionary); *Sierra Club v. Train,* 557 F.2d 485, 491 (5th Cir. 1977) (EPA decision to enforce the Federal Water Pollution Control Act was discretionary, even though the statute mandates that the Administrator "shall" issue a compliance letter if he finds a violation). Moreover, the accompanying regulations addressing ITP revocations speak in discretionary terms: a permit "may be suspended" for non-compliance with permit conditions, 50 C.F.R. § 13.27; and "may be revoked" for willful violations or failure to correct within 60 days deficiencies that were the bases of permit suspension, 50 C.F.R. § 13.28.

 Plaintiffs argue that the Service has completely abdicated its responsibility in monitoring and policing compliance with the Permit, and that the Service liberally caters to the County's every whim when it prefers to deviate from the ITP's dictates. The Service denies such allegations. Rather, it asserts that FWS staff has worked with the County on implementation, notified the County of complaints concerning alleged violations, and allowed the County the opportunity to respond or to correct violations. The record contains evidence of the ongoing cooperative effort between FWS and the County. The record also reflects the County's effort in ensuring the HCP's success by, among other things: 1) marking and designating beach areas; 2) preparing the rut removal program; 3) preparing the training for County personnel and concessionaires; 4) initiating efforts on the light management program; 5) reorganizing the Volunteer Turtle Patrol. Annual reports for 1997 and 1998 discuss the implementation of each provision of the HCP and the Permit and then provide an assessment and recommendations for improvements.

The Secretary argues that its decision to find non-compliance with the Permit must take into account many factors, including the overall effectiveness of the program during its implementation,[25] the probability that compliance orders will improve or impede progress, and whether the specific situation deserves the agency's limited resources, given the many competing ESA priorities. The record contains ample evidence that the Service reasonably exercised its judgment not to revoke the permit based on the County's response to complaints and continual efforts to achieve full compliance with the ITP's terms.

The Court agrees with the Secretary that revocation of the permit would not benefit anyone, including the Plaintiffs. The record demonstrates that the Service and the County have continuously worked together to ensure greater protections for the nesting sea turtles and hatchlings. The record reflects the County's consistent efforts to comply and improve compliance with policing, training, lighting management, and reporting requirements. Revocation of the permit may result in the elimination of beneficial conservation programs now in place. Without the HCP and Permit, the County would be free to return the beach to pre-ITP conditions,

---

**25.** For example, in a recent permit evaluation, the Secretary raised several concerns regarding the County's compliance with the permit in several areas, including: 1) the presence of all terrain vehicles (ATV's) in the conservation zone; 2) concessionaires leaving garbage on the beach; 3) garbage collections not occurring in the Natural Beach Area during the afternoon; and 4) garbage trucks not driving on the wetted sand. [AR 77.2.] In light of these noted problems, the Secretary weighed relevant factors and concluded that the County was "doing a good overall job with the implementation of the HCP and ITP."

which would once again necessitate legal recourse.

In a perfect world, no violations of the ITP would occur. However, potential violations are a reality. The very language of the ESA contemplates possible permit violations. The Service must choose the best way to deal with them in light of several factors. Revocation of the permit in the face of the County's good faith attempted compliance would serve to frustrate the permit's mitigating measures, which ultimately would result in fewer protections for the sea turtles. In addition to the greater restrictions on beach activities, the Permit imposes comprehensive FWS oversight, which also affords increased protection for the turtles.

The Secretary's enforcement of the permit is discretionary and his decision concerning permit revocation is entitled to deference. The record contains evidence that the Service used its discretion reasonably in not revoking the County's ITP. Accordingly, the Court will not disturb the Secretary's decision not to revoke the permit.

### D. The Secretary did not violate the ESA by refusing to reinitiate consultation.

Plaintiffs assert that the Service should have reinitiated consultation under § 7 of the ESA. The applicable federal regulation requires reinitiation of consultation if: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d)

a new species is listed or critical habitat designated that may be affected by the identified action. *See* 50 C.F.R. § 402.16. Plaintiffs urge reinitiation based on the "new information" factor. This alleged new information includes 1) alleged permit violations; and 2) a new scientific study and nesting data collected after the permit was issued. [Sec.Amend.Compl. ¶¶ 52–54.] [26]

Few cases inform the Court's decision on this point. Reinitiation of consultation under § 402.16 has been discussed in at least two decisions, the distinguishable facts of which provide little guidance here. *See Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987) (finding arbitrary and capricious the Army Secretary's decision not to reinitiate consultation upon request of the Fish and Wildlife Service, the agency with superior expertise); *Center for Marine Conservation v. Brown*, 917 F.Supp. 1128, 1144–46 (S.D.Tex.1996) (finding that reinitiation of consultation had in fact been initiated contrary to plaintiff's assertion).

■ The Court has carefully considered whether Plaintiffs' posited "new information" requires reinitiation of consultation under the applicable regulation. As stated above, the ESA contemplates that some permit violations may occur. When they do occur, they cannot fairly be characterized as "new information" which the Service had not previously considered. Second, with respect to the "new scientific study," Plaintiffs have not met their burden of showing that this information reveals effects on the sea turtles that are different or more extensive than those that the Secretary previously considered.

■ Plaintiffs next assert that reinitiation of consultation is necessary because the permit has been amended pursuant to paragraph J of the Permit. The ITP's amendment provision provides a detailed

---

**26.** Plaintiffs contend in their papers that the Eleventh Circuit's *Loggerhead* ruling constitutes "new information." They focus on the appellate court's decision with respect to artificial beachfront lighting. The Eleventh Circuit addressed, in part, a beach lighting ordinance no longer in effect. Plaintiffs' argument with respect to the Eleventh Circuit's decision is without merit and warrants no discussion.

procedure to be followed when unforeseen circumstances require an amendment of the Permit's terms. Plaintiffs have cited no authority for the proposition that permit amendment automatically triggers reinitiation of consultation. The federal regulations contain different provisions addressing permit amendment and reinitiation of consultation. It would make little sense to allow for permit amendments, but then require the Secretary to undertake the entire consultation process again when amendment becomes appropriate. As the Ninth Circuit has held, not "every modification of or uncertainty in a complex and lengthy project requires the agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987).

Finally, the Court notes that reconsultation is built into the permitting procedure. The County's permit has a five-year life. According to the Secretary, the ITP's length was calculated to allow the County a reasonable time to establish the protective programs provided therein and to monitor results. Since the Permit expires in 2001, the County must soon apply for another ITP if they desire continued exemption from the ESA's taking prohibition. If so, the Service must begin consultation anew under § 7 and interested parties, including Plaintiffs, will again have the opportunity to comment on the proposed permit's terms. Because Plaintiffs have offered no facts that would require the Service to reinitiate consultation on the County's ITP, they are entitled to no relief on this claim.

## VI. Conclusion.

Clearly the Plaintiffs are dissatisfied with the ITP's issuance and its subsequent administration. It is equally obvious from their papers that Plaintiffs wish to substitute their judgment for the Service's. Neither the Court nor the Plaintiffs may do so under the APA. The voluminous administrative record contains the requisite support for the Service's decisions to approve Volusia County's Habitat Conservation Plan and grant the Incidental Take Permit, and its refusal to revoke the Permit or to reinitiate consultation. Plaintiffs fail to demonstrate that any of the Secretary's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, the Secretary is entitled to judgment on all of Plaintiffs' claims.

Based on the foregoing, it is ORDERED as follows:

1. Federal Defendant's Motion for Summary Judgment (Doc. 219), filed January 13, 2000, is GRANTED.

2. Second Motion for Partial Summary Judgment by Defendant, County Council of Volusia County, Florida (Doc. 220), filed January 14, 2000, is GRANTED insofar as Plaintiffs seek any relief from Defendant, Volusia County as to Counts 2 through 5.

3. Plaintiffs' Motion for Partial Summary Judgment (Doc. 222), filed January 14, 2000, is DENIED.

4. Plaintiffs' Motion to Strike Affidavit of Dawn Zattau (Doc. 237), filed March 8, 2000, is DENIED.

5. The parties' Joint Motion and Memorandum to File Parties' Final Pretrial Statement Out of Time (Doc. 258), filed May 3, 2000, is GRANTED. The Clerk is directed to docket the Parties' Final Pretrial Statement, attached to Doc. 258.

6. Plaintiffs' Motion to Reconsider and to Amend Order (Doc. 250), filed April 12, 2000, is DENIED. This Court has recognized three grounds justifying reconsideration of an order: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *See Lamar Advertising of Mobile, Inc. v. City of Lakeland*, 189 F.R.D. 480, 489 (M.D.Fla. 1999); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D.Fla.

1994). Plaintiffs have not demonstrated entitlement to relief on any ground.[27]

7. The Clerk shall enter judgment providing that Plaintiffs are entitled to no relief on their claims against Defendants County Council of Volusia County and Bruce Babbitt, in his official capacity as Secretary of the United States Department of the Interior, and further providing that Defendants shall recover their costs of action.

8. The Clerk is directed to close this case.

---

**27.** However, the Court acknowledges that the lighting ordinances challenged in Count 1 of Plaintiffs' Second Amended Complaint were amended by the County in June 1999. The analysis contained in the Court's March 24, 2000 Order reflects the Court's understanding that the June 1999 amendments raised new post-appeal issues in this action.